**REVISED**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 96-20200**
_____

**JANET L. VAUGHT _et al._,**

**Plaintiffs-Appellants,**

**versus**

**SHOWA DENKO K.K. _et al._,**

**Defendants-Appellees.**

_____

**Appeals from the United States District Court**
**for the Southern District of Texas**

_____

March 10, 1997

Before HIGGINBOTHAM, SMITH, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

For this diversity action, the key issues at hand are when the limitations period began running under Texas law for the Vaughts' cause of action arising out of Janet L. Vaught's use of L-tryptophan, a nutritional supplement, and whether her membership in a putative federal class action in another State tolled the Texas limitations period until class certification was denied. Asserting, _inter alia_, that a diligent, but fruitless, inquiry was made as to whether the Vaughts had a cause of action, the Vaughts challenge the summary judgment granted Defendants on limitations grounds. We **AFFIRM.**

I.

In August 1987, while hospitalized for injuries received in an automobile accident, Janet Vaught (Vaught) was prescribed L-tryptophan, an over-the-counter nutritional supplement. She had never taken this product. After her hospitalization, however, she continued to take L-tryptophan for several months pursuant to prescription purchases. In late 1987 or early 1988, she began to experience various unexplained physical symptoms: fatigue, swollen neck glands, sore throats, body aches, burning sensations, tingling on her legs, and muscle and joint pain. She stopped taking L-tryptophan in December 1988, when she learned that she was pregnant.

On 4 April 1990, Vaught read a newspaper article about an action filed by a Houston, Texas, lawyer on behalf of a woman who allegedly contracted eosinophilia myalgia syndrome (EMS) from L-tryptophan. EMS is a multisystemic disorder characterized by severe muscle and joint pain, swelling of the arms and legs, skin rash, fever, and sometimes neuropathy, resulting in paralysis and death. In the fall of 1989, the Food and Drug Administration (FDA) established that over 280 cases of EMS were connected to the ingestion of L-tryptophan, a "virtually unequivocal" epidemiological link. As a result, the FDA issued a nationwide, mandatory recall of L-tryptophan in late November 1989.

Vaught noticed that she suffered some of the same symptoms that the newspaper article described as indicative of EMS, such as fatigue, stiffness, and muscle and joint pain. She contacted a paralegal (now the Vaughts' lawyer) in the Houston lawyer's office,

to obtain information about EMS, although Vaught contends that she did not think she had EMS at that time. Her contact with that law firm led her to contact two doctors conducting an EMS study at Baylor University Medical School, Drs. Harati and McKinley.

Dr. McKinley sent her an "L-tryptophan Eosinophilia-Myalgia Patient Data Sheet". When Vaught began filling out the questionnaire on 18 April 1990, she thought she might have EMS, so she called the Baylor doctors for their opinion. Vaught spoke with each of them at the end of April.

Also in April 1990, after reading the newspaper article, Vaught contacted Dr. Keichian, who had treated her for her automobile accident injuries, and told him that she had taken L-tryptophan. Dr. Keichian ordered a blood test, and on 25 April told Vaught that her eosinophil levels were normal and that she did not have EMS.

That June, Vaught arranged to have an examination done by one of the Baylor doctors, Dr. Harati. She brought her medical records and the completed Patient Data Sheet to the examination. Once again, she was advised that she had normal eosinophil levels in her blood and did not have EMS. Dr. Harati referred Vaught to Dr. Croock, a Baylor University rheumatologist, for further evaluation.

Vaught was examined by Dr. Croock on 13 July 1990; he told her that she was not suffering from EMS but from fibromyalgia or fibrositis. He gave Vaught information on fibromyalgia and prescribed Elavil, a tricyclic antidepressant used primarily for treating that ailment.

Vaught took Elavil for approximately six months, and her condition improved somewhat. Her symptoms, however, never completely disappeared, in spite of her attempts at other curative measures, such as physical therapy.

By the end of 1992, Vaught's condition worsened; she experienced dizziness, fainting spells, and respiratory and gastrointestinal problems. In late 1992 or early 1993, she again became concerned that she might have EMS. She contacted her family physician, Dr. Fields. And in January 1993, she consulted Dr. Patton. That February and March, she underwent muscle and sural nerve biopsies to rule out EMS. Dr. Fields then recommended Vaught to Dr. Burns; in April 1993, he diagnosed EMS on the basis of Vaught's biopsies, medical records, exams, and blood work.

Vaught contacted the paralegal with whom she had spoken in 1990 and who had become a practicing attorney in Houston. On 28 April 1993, Vaught and her husband filed this action in Texas state court against Showa Denko K.K. and its American distributors; it was removed to federal court in February 1994. That June, the Panel on Multidistrict Litigation ordered this action transferred to the United States District Court for the District of South Carolina to be joined with pending nationwide L-tryptophan litigation being conducted there (MDL No. 865). In September 1995, this action was conditionally remanded to district court in Texas for further proceedings.

Defendants then moved for summary judgment on limitations grounds. Following a hearing in January 1996, the district court granted the motion.

II.

The Vaughts present three issues. First, they contend that a genuine issue of material fact exists as to when their cause of action accrued. Next, they seek certification of the following question to the Texas Supreme Court: "Under the Texas discovery rule, does a plaintiff's diligent, but fruitless, inquiry into whether she has an actionable toxic tort suspend the statute of limitations running against her claim?". Finally, they maintain that Janet Vaught's membership in a putative nationwide L-tryptophan class action tolled the limitations period until class certification was denied.

We review a summary judgment *de novo*, applying the same standard as the district court. *E.g.*, **Bodenheimer v. PPG Indus., Inc.**, 5 F.3d 955, 956 (5th Cir. 1993). Such judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law". FED. R. CIV. P. 56(c). In making this determination, we are to draw all reasonable inferences in favor of the nonmovant. *E.g.,* **Bodenheimer,** 5 F.3d at 956. And, because this is a diversity action, we apply Texas substantive law. **Erie R.R. Co. v. Tompkins**, 304 U.S. 64 (1938).

A.

In Texas, a personal injury action must be filed "not later than two years after the day the cause of action accrues." TEX. (CIV. PRAC. & REM.) CODE ANN. § 16.003(a). Generally, accrual occurs on the date "the plaintiff first becomes entitled to sue the defendant based upon a legal wrong attributed to the latter", even if the plaintiff is unaware of the injury. *Zidell v. Bird*, 692 S.W.2d 550, 554 (Tex. Ct. App. 1985).

The "discovery rule" is an exception to this general rule. *See Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990). Under Texas' discovery rule, the limitations period is tolled until the plaintiff discovers, *or through the exercise of reasonable diligence should have discovered*, the nature of her injury. *See id.; Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex. 1988).

The term "discovered", however, is quite broad. In *Hoover v. Gregory*, 835 S.W.2d 668 (Tex. Ct. App. 1992, error denied), the Texas Court of Appeals explained: "'Discovery' ... occurs when a plaintiff ha[s] knowledge of such facts as would cause a reasonably prudent person to make an inquiry that would lead to discovery of the cause of action." *Id.* at 671. Such knowledge is "in the law equivalent to knowledge of the cause of action for limitation purposes". *Bayou Bend Towers Council of Co-Owners v. Manhattan Constr. Co.*, 866 S.W.2d 740, 747 (Tex. Ct. App. 1993, error denied).

In other words, a cause of action may accrue before a plaintiff actually learns the "details of the evidence by which to establish his cause of action". *Hoover*, 835 S.W.2d at 672-73

- 6 -

(quoting **Citizens State Bank v. Shapiro**, 575 S.W.2d 375, 385 (Tex. Ct. App. 1978, error refused nre)). As held in the controlling case for purposes of this appeal, **Bell v. Showa Denko K.K.**, 899 S.W.2d 749, 754 (Tex. Ct. App. 1995, error denied) this is because the discovery rule "mandates that the plaintiff exercise reasonable diligence to discover facts of negligence or omission".

It is undisputed that Vaught first consumed L-tryptophan from mid-1987 to 1988, more than two years before this action was filed in April 1993. On these facts, the district court concluded that the limitations period began in 1987, when Vaught first took L-tryptophan, but that it was tolled until April 1990, when the discovery period began. (Defendants do not contest this.) It was then that Vaught read the newspaper article; connected her symptoms with EMS; and contacted the lawyer's office. Therefore, she had two years from that point within which to file suit; she failed to do so.

The Vaughts contend that there is a material fact issue on when the cause of action accrued. They concede that a diagnosis of a disease is not a *sine qua non* to "knowledge" under the discovery rule but claim that Janet Vaught conducted a diligent (albeit fruitless) inquiry into whether Defendants' product was the cause of her symptoms. (Along this line, it bears repeating that Vaught's inquiry apparently ended in mid-July 1990, when she was diagnosed with fibromyalgia. This diagnosis was only approximately three and one-half months after the discovery period began (when she read the newspaper article). And after the July 1990

diagnosis, she continued to have adverse symptoms, despite taking the prescribed medication for the diagnosis of fibromyalgia for approximately six months.)

If Janet Vaught exercised reasonable diligence, the Vaughts continue, the legal consequence cannot be dismissal of her action. Therefore, they maintain that the discovery rule should be read to require "knowledge of sufficient facts that actually connect the injury and the tortfeasor so as to warrant the filing of a suit by a reasonable person".

Defendants respond that it is knowledge of the injury — not knowledge that the injury is actionable — that triggers the discovery period (and the running of limitations). Thus, once a plaintiff learns that she has been harmed and associates that harm with a potential tortfeasor (such as a product manufacturer), she has two years to discover relevant evidence; difficulty in obtaining a confirming diagnosis during that interval does not toll the two-year period.

In this regard, Defendants contend that the above-referenced decision by the Texas Court of Appeals in 1995 in **Bell v. Showa Denko K.K.** controls. We agree. **Bell** is very similar factually to this action, and squarely addresses the Vaughts' contention as to when the discovery period began.

Bell also took L-tryptophan and allegedly contracted EMS as a result. **Bell**, 899 S.W.2d at 752. Bell had suffered from severe muscle pains from October 1989 to March 1990. Like Vaught, Bell read about EMS in a newspaper article in late 1989 or early 1990,

*id.* at 754, and suspected that she had EMS based on the fact that her symptoms corresponded to those reported by EMS victims (muscle pains and high eosinophil levels in blood). *Id.* at 754-55. Bell consulted with various doctors in July 1990; filled out an "L-tryptophan Eosinophilia-Myalgia Patient Data Sheet"; was told by doctors in March and October 1990 that she might have EMS; but did not receive a positive diagnosis until February 1992. *Id.* at 755. Bell filed suit in Texas state court in September 1992 against Showa Denko, K.K. and others. *Id.* at 752. The trial court granted the defendants summary judgment on limitations grounds. *Id.*

The Texas Court of Appeals affirmed, *id.* at 755, concluding that Bell had "knowledge" of her injury at some point between March and July 1990, when she connected ("associated") her symptoms with the ingestion of L-tryptophan. *Id.* That knowledge was sufficient to trigger the two-year statute; therefore, Bell's September 1992 filing was too late. *Id.* (As discussed *infra*, the court also rejected the tolling contention advanced here.)

It is undisputed that, in April 1990, Janet Vaught made a connection between her physical symptoms, EMS, and the ingestion of L-tryptophan. That knowledge was sufficient in **Bell** to trigger the discovery period; it has the same legal effect here.

Vaught's difficulty in obtaining a positive EMS diagnosis does not distinguish this case from **Bell**. As the **Bell** court explained, "the question to be determined is not whether a plaintiff has actual knowledge of the particulars of a cause of action ...; rather, it is whether the plaintiff has knowledge of facts which

- 9 -

would cause a reasonable person to diligently make inquiry *to determine his or her legal rights*." *Id.* at 754 (emphasis added); *see also* **Hoover**, 835 S.W.2d at 671-72; **Shapiro**, 575 S.W.2d at 385. This language presumes that the discovery period begins *before* a plaintiff has actionable knowledge — or, as the Vaughts describe it, knowledge of "sufficient facts that actually connect the injury and the tortfeasor". In sum, there is no exception under Texas law for those who make a diligent inquiry but fail to obtain a positive diagnosis.

We are not blind to the Vaughts' contention that **Bell** places similarly situated plaintiffs in a difficult situation. They assert that, if they had filed suit prior to 1993 — when they claim they could not produce "a single medical witness to confirm [Janet Vaught's] suspicion that she had EMS" — they might well have been subject to sanctions under TEX. R. CIV. P. 13 (the counterpart to FED. R. CIV. P. 11), which forbids making groundless factual and legal allegations. *See* TEX. R. CIV. P. 13. Yet the consequence of waiting until she obtained a positive diagnosis in 1993 was that her suit was dismissed as time-barred.

The source of the problem is not the Texas discovery rule; it may well be the diagnoses of the first four doctors consulted, all of whom advised Vaught that she did not have EMS. The discovery rule operates to trigger the statute of limitations once a plaintiff has the requisite knowledge, regardless of whether or how the plaintiff is advised by the medical community. In this regard, the result commanded by **Bell** is supported by **United States v.**

*Kubrick*, 444 U.S. 111 (1979), in which the Supreme Court considered whether an action under the Federal Tort Claims Act for alleged malpractice in a Veterans Administration hospital had been timely filed:

> If [a plaintiff] fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit, even though more than two years have passed from the plaintiff's discovery of the relevant facts about [the] injury.

*Id.* at 124.

As a final matter, we note that a statute of limitations can operate to the detriment of both plaintiffs and defendants. In essence, the statute is a compromise; on occasion, it can cause seemingly unfair results. The Texas Supreme Court has explained that the primary purpose of such statutes is "to compel the exercise of a right of action within a reasonable time that the opposing party has a fair opportunity to defend while witnesses are available and the evidence is fresh in their minds." *Willis*, 760 S.W.2d at 644; *see also* *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990). They establish a "point of repose" and operate to "terminate stale claims". *Murray*, 800 S.W.2d at 828. Nevertheless, Texas' discovery rule, a judicially created exception, theoretically permits an action to be filed long after the limitations period would otherwise have expired, placing defendants like Showa Denko at a possible disadvantage in terms of witnesses and evidence.

- 11 -

On the other hand, Texas has declined to construe the discovery rule to toll limitations periods until "a plaintiff discovers a specific cause of action against a specific defendant". *See* **Moreno**, 760 S.W.2d at 357 n.9. That approach would "effectively 'expand ... to infinity the time period during which [an action] could be brought'". **Id.** (quoting **Pastierik v. Duquesne Light Co.**, 526 A.2d 323, 325 (Pa. 1987)). Thus, a plaintiff like Vaught, who may be incorrectly advised, may be precluded from pursuing her cause of action, even though she took the necessary investigatory steps mandated by the discovery rule.

B.

The Vaughts ask us to certify to the Texas Supreme Court the question addressed above: "Under the Texas discovery rule, does a plaintiff's diligent, but fruitless inquiry into whether she has an actionable toxic tort suspend the statute of limitations running against her claim?" Certification to the Texas Supreme Court is appropriate only if "it appears to the certifying court that there is no controlling precedent in the decisions of the Supreme Court of Texas". TEX. R. APP. P. 114(a); *see* TEX. CONST. art. V, § 3-c; *see also* **Swearingen v. Owens-Corning Fiberglas Corp.**, 968 F.2d 559, 564 (5th Cir. 1992).

This procedure is not "a panacea for resolution of those complex or difficult state law questions which have not been answered by the highest court of the state." **Transcontinental Gas Pipeline Corp. v. Transportation Ins. Co.**, 958 F.2d 622, 623 (5th Cir. 1992). Thus, even in the absence of decisions by the Texas

- 12 -

Supreme Court or intermediate appellate courts on an issue of state law, we will not necessarily certify a question. *See, e.g.*, *Swearingen*, 968 F.2d at 564.

Existing Texas law (especially *Bell*) adequately addresses the discovery rule issue. Accordingly, we decline the certification request.

C.

The Vaughts' final contention is that Janet Vaught's potential membership in a putative L-tryptophan federal class action tolled the limitations period until class certification was denied. On or before 27 September 1990, three nationwide class actions were filed in Maryland against various defendants, including Showa Denko, on behalf of "natural persons who sustained personal injuries as a result of ingesting ... L-tryptophan". Two of the actions were filed in federal court; one filed in state court was removed to federal court. *Rapoport v. P. Leiner Nutritional Products Corp.* (JH-90-397) (D. Md. — filed in state court 20 Dec. 1989 and removed to federal court 2 Feb. 1990); *Rapoport v. Showa Denko America* (JH-90-518) (D. Md. — filed 13 Feb. 1990); *Rapoport v. Showa Denko K.K.* (JH-90-2516) (D. Md. — filed 27 Sept. 1990). All three were transferred by the Panel on Multidistrict Litigation to the earlier-referenced litigation in South Carolina (MDL No. 865). Certification was denied in two of the actions in January 1992; the third action was dismissed in May 1992 without reaching the certification issue.

The Vaughts contend that, under the decisions of the Supreme Court in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983), and of the Texas Court of Appeals in *Grant v. Austin Bridge Constr. Co.*, 725 S.W.2d 366 (Tex. Ct. App. 1987), Janet Vaught's membership in the putative *Rapoport* classes tolled the limitations from running against her claim (putative class action tolling). Thus, even assuming the limitations period began running on 4 April 1990, when she read the newspaper article, the period would have been tolled, at the latest, on 27 September 1990 (176 days later), when the last *Rapoport* action was filed; and when class certification was denied on 3 January 1992, the limitations period would have resumed. Therefore, the Vaughts would have had until 11 July 1993 (two years less 176 days equals 554 days) to file suit, making their April 1993 filing timely.[1]

_____

[1]    In ruling against this contention, the district court stated initially that Janet Vaught had opted-out of the putative *Rapoport* classes by independently pursuing her claim. In response to the Vaughts' counsel urging that she had not opted-out — because she had not filed suit until after denial of class certification — the district court stated:

> There's nothing in the facts here that suggest
> that she did not pursue her claim because of
> the pendency of that action. She consulted
> counsel and doctors and thought she didn't
> have a claim. Unilateral mistake of fact.

We agree with the district court that the record does not reflect that Vaught withheld filing suit pending a class certification ruling. Moreover, Vaught does not claim that she did. (In any event, any thought that Vaught withheld filing pending certification is belied by the fact that this action was not filed until April 1993, approximately 16 months after denial of certification in South Carolina.)

In ***American Pipe*** and ***Crown, Cork & Seal***, the Court held that filing a FED. R. CIV. P. 23 class action tolled limitations for potential class members pending the certification ruling. ***Crown, Cork & Seal***, 462 U.S. at 353-54; ***American Pipe***, 414 U.S. at 552-53. And, in ***Grant***, after the Texas Court of Appeals determined that TEX. R. CIV. P. 42 was patterned after Federal Rule 23, the court relied on ***American Pipe*** and ***Crown, Cork & Seal*** in holding that a state class action tolled the limitations period for all potential class members. ***Grant***, 725 S.W.2d at 370.

Defendants counter that the ***American Pipe*** tolling rule governs only property damage-type claims, not mass personal injury claims, for which class certification has historically been disfavored. *See* ***Castano v. American Tobacco Co.***, 84 F.3d 734, 746-47 (5th Cir. 1996) (denying nationwide class certification for proposed class of nicotine-dependent persons who smoked and purchased cigarettes manufactured by tobacco companies and of their families). They assert that the ***American Pipe*** holding was based on the premise that a class action would provide a defendant with sufficient notice of the "potential claims of all potential class members".

---

Accordingly, a possible issue might be whether Janet Vaught's independent actions (possibly including contacting the law firm and consulting with doctors) and otherwise not awaiting a class certification ruling preclude her from receiving shelter under the putative class action tolling rule advanced here. It appears that the district court ruled that they do. On the other hand, for our *de novo* review, neither side presses the issue. In any event, because, as discussed *infra*, we conclude that the Vaughts' class action tolling contention fails, we need not consider this possible issue.

- 15 -

In any event, Defendants assert primarily that the Texas Court of Appeals' decision in **Bell** also controls this issue because **Bell** held that, under **American Pipe**, class action does not toll state personal injury claims imputed in federal mass tort. The Vaughts maintain, *inter alia*, that the tolling language in **Bell** is *dicta*, because **Bell** also held that the class action tolling issue had not been preserved for appeal. **Id.** at 756-57. However, under Texas law, "[w]hen [the] highest court gives two grounds for a decision, both of which are carefully developed and supported by authority, an intermediate court cannot justifiably disregard either of these grounds as *obiter*." **Inn of Hills, Ltd. v. Schulgen & Kaiser**, 723 S.W.2d 299, 301 (Tex. Ct. App. 1987, error refused nre) (quoting **Reynolds-Penland Co. v. Hexter & Lobello**, 567 S.W.2d 237, 243 (Tex. Civ. App. 1978) (Guittard, J., dissenting)). Although the foregoing authority refers to alternative holdings by the Texas Supreme Court, this alternative-holdings rule must, of necessity, apply to decisions by Texas' intermediate appellate courts as well. In **Bell**, the procedural and substantive bases for the tolling rulings are independently developed and supported and do not depend on hypothetical facts; neither can be disregarded as *dicta*.

We conclude that, pursuant to **Bell**, the **Rapoport** actions did not toll the limitations period for the Vaughts. We arrive at this conclusion, however, in a somewhat circuitous manner. As before, we begin with **Bell.**

Bell contended that, under **Grant** and the **American Pipe** line of cases, a federal class action filed in New Mexico tolled

- 16 -

limitations on her claim until class certification was denied. **Bell**, 899 S.W.2d at 756-57. In addressing this issue on the merits, the **Bell** court concluded first that the **American Pipe** line of cases did not directly control, because they involved the tolling effect of putative *federal* class actions on *federal* statutes of limitations. **Id.** at 757. Whether a *state* statute of limitations would be tolled by a *federal* class action, the court explained, was a question of state law. The **Bell** court construed **Grant** to apply only to the tolling effect of a *state* class action on *state* claims. **Id.** at 757-58. In addition, the **Bell** court concluded, the **American Pipe** tolling rule was meant to apply only where a class action gives a defendant notice of the "type and potential number of the claims against it" — for example, where a "discernible group of people claim[ ] injury to certain property". **Id.** at 758. The court explained:

> For us to hold that the filing of a mass personal injury suit, in a federal court, in another state, with the variety of claims necessarily involved in such a case, entitled a plaintiff to a tolling of the limitations period such as in *American Pipe*, would be an extension not warranted by [**Grant**] and we refuse to do so.

**Id.** Hence, the federal class action involved (New Mexico) did not toll the limitations period on Bell's state claims pending a certification ruling.

To circumvent this holding in **Bell**, the Vaughts cite Supreme Court and Fifth Circuit precedent, *see* **Board of Regents v. Tomanio**, 446 U.S. 478 (1980); **Johnson v. Railway Express Agency**, 421 U.S. 454 (1975); **F.D.I.C. v. Dawson**, 4 F.3d 1303 (5th Cir. 1993), *cert.*

- 17 -

*denied*, 114 S. Ct. 2673 (1994), contending that a *federal court* may disregard a *state tolling rule* if it is inconsistent with a *federal policy* — in this case, the tolling effect of a putative federal class action. Federal Rule 23 seeks to avoid a multiplicity of actions in various courts and the "filing of repetitious papers and motions". **American Pipe**, 414 U.S. at 550. Therefore, the Vaughts assert that, if the limitations period is not tolled during the pendency of a Rule 23 class certification ruling, potential class members will have to adopt a "belt-and-suspenders attitude": each will have to file suit individually to preserve her claim in the event that certification is later denied.

None of the cited cases, however, support this contention. **Johnson** and **Tomanio** involved *federal* causes of action under 42 U.S.C. §§ 1981 and 1983. **Tomanio**, 446 U.S. at 482; **Johnson**, 421 U.S. at 456. Because federal law does not specifically provide the limitations period, state law is "borrowed" to provide it. **Johnson**, 421 U.S. at 462. In fact, **Johnson** and **Tomanio** hold that, in addition to borrowing a state's statute of limitations for a § 1981 or § 1983 action, a federal court should also borrow the corresponding tolling rules for such actions. **Tomanio**, 446 U.S. at 485-86; **Johnson**, 421 U.S. at 463-64. Of course, any borrowed state law cannot be "inconsistent with the constitution and laws of the United States". 42 U.S.C. § 1988(a); *see* **Tomanio**, 446 U.S. at 485-86; **Johnson**, 421 U.S. at 465.

**Dawson** involved a federal claim under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA)

- 18 -

brought by the FDIC as receiver. *Dawson*, 4 F.3d at 1305-07. Although FIRREA provides a limitations period for such claims, it cannot revive stale state law claims; thus, a court must determine whether a claim would be barred by a state statute of limitations. *Id.* at 1306-07. In *Dawson*, that inquiry included determining whether the doctrine of adverse domination tolled the state limitations period and whether, for that question, federal or state law controlled. *Id.* at 1308. Citing *Johnson*, our court held that, because we were "borrowing" a state statute of limitations, state tolling principles would be the "'primary guide'", *id.* at 1308-09 (quoting *Johnson*, 421 U.S. at 465), and could be disregarded only if "inconsistent with federal policy". *Id.* (citing *Tomanio*, 446 U.S. at 485-86).

Needless to say, these cases are inapposite to this case; they deal with borrowing state law to fill gaps left by Congress for federal causes of action. In a § 1981, § 1983, or FIRREA action, federal law still supplies the rules of decision. It makes sense, therefore, that under 42 U.S.C. § 1988 and the *Johnson* and *Tomanio* cases, a federal court may disregard a state tolling rule on certain occasions.

By contrast, diversity actions, such as the one at hand for product liability, involve state causes of action, where state law, of course, provides the rules of decision, even in federal court. In fact, the Supreme Court has stated that generally, for diversity actions, a federal court should apply not only state statutes of limitation but also any accompanying tolling rules. *Walker v. Armco*

***Steel Co.***, 446 U.S. 740, 750-53 (1980) (rendered only two weeks after ***Tomanio***).

The case providing the strongest support for the Vaughts appears to be ***Byrd v. Blue Ridge Rural Elec. Coop.***, 356 U.S. 525 (1958). At issue was whether, in a diversity action, the judge or the jury decided, under a state workers' compensation act, the question of employer immunity. ***Id.*** at 533-34. The applicable state rule, pursuant to case law, provided that the judge decided the question, ***id.***; however, in federal court civil actions, the jury traditionally, of course, resolved disputed questions of fact. ***Id.*** at 534. Therefore, the Supreme Court held that the federal court should *not* follow the state rule. ***Id.*** at 538-40.

The Court first explained that the state rule was not "an integral part of the special relationship created by the [workers' compensation] statute", but was "merely a form and mode of enforcing the immunity ... and not a rule intended to be bound up with the definition of the rights and obligations of the parties". ***Id.*** at 536. In addition, the federal policy of having juries decide disputed questions of fact was an "essential characteristic" of the federal system, strongly influenced by the Seventh Amendment. ***Id.*** at 537-38. For the Court, the importance of this federal policy outweighed the state rule.

The Supreme Court's subsequent decision in ***Hanna v. Plumer***, 380 U.S. 460 (1965) (holding that federal court sitting in diversity should apply FED. R. CIV. P. 4, rather than conflicting

state rule, because federal rule was consistent with Rules Enabling Act), does not prevent us from applying *Byrd* to the facts at hand.

*Hanna* concerned a federal rule of civil procedure promulgated pursuant to the Rules Enabling Act, 28 U.S.C. § 2072, that was in "direct collision" with state law. *Hanna*, 380 U.S. at 461-64. In the case at hand, however, there is no federal rule of civil procedure that is in direct conflict with state law. Although the *American Pipe* tolling rule is intended to preserve the policies underlying Rule 23, neither Rule 23 nor any other rule expressly mandates tolling limitations periods. *See* FED. R. CIV. P. 23. Restated, we are not "narrowly construing" the federal rules to avoid a "direct collision" with state law; rather, we are applying the rules' plain meaning. *See Walker*, 446 U.S. at 750 n.9. And, in those cases where "there is no conflict between the Federal Rule and ... state law", *Hanna* does not apply. *Id.* at 752.

Tolling is essentially a judge-made practice, *see Crown, Cork & Seal*, 462 U.S. at 350-54; *American Pipe*, 414 U.S. at 552-59, and nothing in *Hanna* detracts from a *Byrd*-type analysis of a conflict between a judge-made federal practice and a state rule. Neither *Hanna* nor any other Supreme Court case has explicitly overruled *Byrd* or suggested that it no longer retains vitality. (*Walker,* in which the Supreme Court applied a state tolling rule in a diversity case, involved a claimed conflict with FED. R. CIV. P. 3, not a federal practice, as here. *See Walker*, 446 U.S. at 741-43.)

In addition, to the extent our court has previously questioned the vitality of *Byrd* in the light of *Hanna*, it has done so by

suggesting that *Hanna* expanded the power of federal courts to disregard state law in diversity cases:

> We think, in the light of later authority, that *Byrd* gave too little recognition to the federal forum-*qua*-forum interests.... *Hanna* gives us good reason to hold that federal courts have inherent powers under Article III to displace state laws on matters involving their basic competence as courts.

*See* **In re Air Crash Disaster Near New Orleans, La. on July 9, 1982**, 821 F.2d 1147, 1159 (5th Cir. 1987), *cert. granted and judgment vacated on other grounds*, **Pan American World Airways v. Lopez**, 490 U.S. 1032 (1989), *on remand*, 883 F.2d 17 (5th Cir. 1989).

And, the Tenth Circuit has stated that, under *Byrd*, a federal court sitting in diversity may disregard a state tolling rule. **Cook v. G.D. Searle & Co.**, 759 F.2d 800, 803 (10th Cir. 1985) ("A state tolling rule ... will generally govern in diversity actions absent a direct conflict between a state rule and an overriding federal rule or affirmative countervailing federal consideration".) (citing *Byrd*). Under *Byrd*, therefore, the Texas non-tolling rule (stated in *Bell*) could arguably be displaced because it conflicts with the well-established federal tolling practice promulgated in **American Pipe** and **Crown, Cork & Seal**.

Without doubt, there is a strong federal policy favoring the tolling of limitations periods as to all potential members of a Rule 23 class action. The Supreme Court explained in **American Pipe** that a contrary holding would

> frustrate the principal function of a class suit, because then the sole means by which members of the class could assure their

> participation in the judgment if notice of the
> class suit did not reach them until after the
> running of the limitation period would be to
> file earlier individual motions to join or
> intervene as parties — precisely the
> multiplicity of activity which Rule 23 was
> designed to avoid....

*American Pipe*, 414 U.S. at 551.

In *Crown, Cork & Seal*, the Court explained that the *American Pipe* rule applied to all potential class members, not just intervenors. *Crown, Cork & Seal*, 462 U.S. at 353-54. It went on to state that, without tolling, its holding in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), requiring individual notice to absent class members, would make no sense. *Crown, Cork & Seal*, 462 U.S. at 351. Notice is intended to enable class members to opt-out and pursue their claims independently. *Id.* If there were no tolling rule, notice would be irrelevant, because the limitations period for absent class members would most likely have expired, making the right to pursue a claim separately utterly meaningless. *Id.* at 351-52.

In the light of *Bell*, we understand Texas' tolling rule to operate as follows: A state (Texas) class action that raises property damage-type claims tolls a Texas statute of limitations pending a certification ruling. And, consistent with our understanding of this Texas tolling rule, it is unclear whether, under this rule, a *federal* class action filed in Texas or in any

other State would ever toll a Texas statute of limitations, regardless of the type of claims raised.[2]

In any event, this Texas rule clearly conflicts with the well-established federal practice on class action tolling. We conclude, however, that, for this case, the federal interest in that practice does not trump the Texas tolling rule. Unlike the situation in *Byrd* or *Hanna*, neither the federal constitution nor federal law would be displaced. On the other hand, a tolling rule is an "integral part" of a statute of limitations. *See Byrd*, 356 U.S. at 536. Therefore, Texas' interest in its tolling rule has quite considerable depth. This is because its rule is a means of enforcing its statute of limitations, a matter of considerable importance to Texas, one reflecting a deliberate policy choice by its legislature.

In short, we have come full-circle. *Bell* controls. Consequently, summary judgment was proper.

### III.

Because the Vaughts' action is time-barred, the summary judgment awarded Defendants is

**AFFIRMED.**

---

[2] Pre-*Bell*, our court noted that Texas' tolling rule was the same as the federal rule under *American Pipe* and *Crown, Cork & Seal*. *See National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 715 n.25 (5th Cir. 1994) (citing *Grant*). Post-*Bell*, that observation retains little vitality.