Jan Buthlay DOLLING, Plaintiff,

v.

AMANDA HESS CORPORATION, Spentonbush/Redstar Companies, Inc., Ira S. Bushey & Sons, Inc., and Hygrade Operators, Inc., Defendants.

No. Civ.A. G–99–284.

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 16, 2000.

Ronald L. White, Brown Sims Wise & White, Houston TX, for Ron White, mediator.

Stephen Kurt Siess, Clark Depew & Siess, Houston, TX, for Jan Buthlay Dolling, plaintiff.

Robert L. Klawetter, Eastham Watson Dale & Forney Travis, Houston, TX, for Amerada Hess Corp, defendant.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff brings this action against Defendants for personal injuries arising under the Jones Act and general maritime law. Now before the Court is Defendants' Motion for Summary Judgment, filed December 15, 1999. For the reasons stated below, the Motion for Summary Judgment is **GRANTED.**

### I. FACTUAL SUMMARY

From March 1988 until December 1991, Plaintiff worked as a master aboard a fleet of barges owned and operated by Defendants. These barges delivered petroleum products to a variety of destinations in the United States. Plaintiff alleges that while working for Defendants he was exposed to toxic substances and vapors emitted from the petroleum cargo carried on the barges. As a result, Plaintiff alleges that he developed various physical ailments; doctors ultimately diagnosed Plaintiff with chronic inflammatory demyelinating polyneuropathy ("CIDP"). On May 11, 1999, Plaintiff filed suit, alleging a cause of action for negligence under the Jones Act. Plaintiff also asserts claims for unseaworthiness and failure to pay maintenance and cure.

### II. ANALYSIS

A. *Summary Judgment Standard*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323,

106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the non-moving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.*, 799 F.Supp. 691, 693 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2553; *see also* FED. R.CIV.P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita*, 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir.1995). The Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. *See Matsushita*, 475 U.S. at 585–87, 106 S.Ct. at 1355–56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 586–87, 106 S.Ct. at 1355–56 (quoting FED.R.CIV.P. 56(e)).

### B. *Plaintiff's Claims Are Time–Barred*

Defendants move for summary judgment on the basis that Plaintiff's claims are barred by limitations. Specifically, Defendants argue that Plaintiff had sufficient knowledge of the critical facts of his injuries and the cause thereof to commence the running of the statute of limitations by a date no later than early 1996. Plaintiff responds that he did not and could not have known about both his injury or its cause until at least September 1998.

The statute of limitations for claims brought under the Jones Act and general maritime law is three years. *See* 45 U.S.C. § 56; 46 U.S.C.App. § 763a ("[A] suit for recovery of damages for personal injury or death, or both, arising out of a maritime tort, shall not be maintained unless commenced within three years from the date the cause of action accrued"); *Clay v. Union Carbide Corp.*, 828 F.2d 1103, 1105 (5th Cir.1987) (applying the three-year statute of limitations period to claims brought under the Jones Act and general maritime law); *Cooper v. Diamond M Co.*, 799 F.2d 176, 178–79 (5th Cir.1986) (applying the three-year limit of 46 U.S.C.App. § 763a to claims for unseaworthiness and maintenance and cure); *cf. Reynolds v. Logan Charter Serv., Inc.*, 565 F.Supp. 84, 86 (N.D.Miss.1983) (insinuating that had the plaintiff's injuries occurred after the enactment of 46 U.S.C.App. § 763a, the three-year state of limitations would apply to the plaintiff's

claims for maintenance and cure).[1]  Accordingly, all instances of personal injury—as well as claims for failure to pay maintenance and cure—occurring more than three years prior to the filing of a lawsuit are barred by the statute of limitations.  Because Plaintiff filed this suit on May 11, 1999, his claims are timely filed only if his causes of action accrued after May 11, 1996.  The critical issue, therefore, is determining the date when the statute of limitations took effect.

The Fifth Circuit has articulated two different rules to determine the accrual of tort claims for statute of limitations purposes: the "time of event rule" and the "discovery rule."  *See Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228–29 (5th Cir.1984).

> [A] cause of action for tort accrues when there has been an invasion of the plaintiff's legally protected interest, usually at the time the tortious act is committed.  Thus, in most cases the Time of Event Rule applies and the statute of limitations begins to run from the time plaintiff was injured.  If, however, plaintiff has sustained "a latent injury which either is not or cannot be discovered until long after the tortious act that caused the injury has occurred … courts have routinely applied the so-called discovery rule."

*Clay*, 828 F.2d at 1105–06 (quoting Albertson, 749 F.2d at 229) (citations omitted).

The court in *Albertson* distinguished two types of latent injury cases: "pure latent injury cases" and "traumatic event/latent manifestation" cases.  A pure latent injury case involves a situation in which "the plaintiff fails to discover either the injury or its cause until long after the negligent act occurred."  *Albertson*, 749 F.2d at 230.

The discovery rule applies to this type of a case.  Alternatively, "[a] traumatic event/latent manifestation case is one in which the plaintiff has sustained both immediate and latent injuries caused by a noticeable, traumatic occurrence.  At the time of the traumatic event, the plaintiff realizes both that he is injured and what is responsible for causing the injury.  The full extent of the harm, however, has not become manifest."  *Id.* at 231.  The time of event rule is applied to this type of a case.  *See id.* at 232 n. 8.  Under either type of latent injury case, the statute of limitations is triggered whenever the plaintiff becomes aware of or has had reasonable opportunity to discover "the critical facts of his injury and its cause."  *Id.* at 233; *accord Clay*, 828 F.2d at 1106.

Plaintiff correctly points out that his case is not governed by the time of event rule, nor can it be characterized as one of traumatic event/latent manifestation.  Plaintiff's exposure to the petroleum fumes did not cause immediate symptoms or injuries, nor did the exposure rise to the level of a "noticeable, traumatic occurrence."  *Albertson*, 749 F.2d at 233; *see also Aerojet–General Shipyards, Inc. v. O'Keeffe*, 413 F.2d 793, 795 (5th Cir.1969) ("The limitations period for occupational diseases begins to run when the employee knows, or reasonably should know, that his condition is a disease which arose out of his employment.").  The evidence conclusively shows that Plaintiff was not aware that his exposure had caused any profound physical injuries until after his employment with Defendant ended.  *See Wilson v. Zapata Off–Shore Co.*, 939 F.2d 260, 268–69 (5th Cir.1991);  *Clay*, 828 F.2d at 1106–07;  *Hagerty v. L & L Marine Servs., Inc.*, 788 F.2d 315, 317 (5th Cir.1986) (all detailing

---

1.  Defendants also assert that Plaintiff's claims are precluded by the common law equity doctrine of laches.  The Court, however, need not address this issue because the three-year statute of limitations contained in § 763a is properly applied to all of Plaintiff's claims, including those for unseaworthiness and maintenance and cure. *See* H.R.Rep. No. 96–737, at

4 (1980) (noting that while claims for maintenance and cure were formerly governed by the doctrine of laches, § 763a "would apply a specific 3–year statute of limitations to those maritime tort actions currently governed by the doctrine of laches"), *reprinted in* 1980 U.S.C.C.A.N. 3303, 3305; *Cooper*, 799 F.2d at 178–79.

circumstances in which the time of event rule should apply—none of which match the particular situation present in this case). Accordingly, the Court declines to apply the time of event rule for determining the running of the limitations period, for case does not warrant analysis using the traumatic event/latent manifestation test.

Having employed the pure latent injury prong under the discovery rule, the Court must now discern when the cause of action actually "accrued." To accomplish this, the Court first must determine when Plaintiff had actual or constructive knowledge of his injury and its cause. *See Crisman v. Odeco, Inc.*, 932 F.2d 413, 415 (5th Cir.1991) (noting with respect to latent injuries that "[a] cause of action under the Jones Act and general maritime law accrues when a plaintiff has had a reasonable opportunity to discover his injury, its cause, and the link between the two").

Plaintiff contends that his cause of action did not accrue until September 1998, when Dr. Obenour diagnosed him with CIDP. Before then, according to Plaintiff, "no specific anatomical diagnosis was reached by any of Plaintiff's treating physicians, and significant conflicts existed between the findings and impressions of each." *Pl.'s Resp. to Defs.' Mot. for Summ.J. at 2.* Plaintiff also asserts that this diagnosis could only be "determined based on comparative nerve function studies made over a period of several years following the manifestation of symptoms." *Id.* Therefore, although Plaintiff may have suspected that his condition was caused by exposure to petroleum, he "cannot be charged with knowledge of the cause of his condition based on his unqualified and medically uncorroborated personal suspicion and belief." *Id.* at 3. Ultimately, Plaintiff claims that his cause of action could not accrue until a physician actually confirmed a causal connection. The Court remains unconvinced by Plaintiff's line of reasoning, for the issue is not when physicians became absolutely certain about Plaintiff's particular etiology; rather, the issue turns on whether Plaintiff had discovered his injury and its cause prior to May 11, 1996 1998.

### 1. When Did Plaintiff Recognize His Alleged Injury?

Plaintiff has long been aware that doctors suspected that he suffers from CIDP. Plaintiff admits first noticing problems in his legs in December 1993, but attributed the ailment to a continuation of difficulties relating to an August 1990 operation on his right foot. *See Dolling Aff.* ¶¶ 3–4. Soon thereafter Plaintiff met with Dr. William Fleming for a neurological consultation. Following an extensive battery of tests, Dr. Fleming observed on June 14, 1994 that "the EMG is consistent with an acute moderately severe geralized peripheral neuropathy" of unknown etiology. *Defs.' Mot. for Summ.J.Ex. C at 000003.* One month later, further lab work ordered by Dr. Fleming indicated CIDP. *See id.* at 000069–000071. In July 1994, Plaintiff also underwent a spinal nerve biopsy performed by Dr. Y. Harati, which ultimately revealed segmental demyelinating neuropathy. *See id.* Ex. D at 000001–000002. Dr. Fleming discussed the results of these tests with Plaintiff and recommended that because of his demyelinating peripheral neuropathy, Plaintiff should not continue working aboard sea-going vessels. *See id.* Ex. C at 000012, 000035. Plaintiff was indeed aware of this diagnosis, as evidenced by the fact that in Fall 1994 he filed for disability benefits with the Texas Rehabilitation Commission asserting that he suffered from a demyelinating peripheral neuropathy. *See id.* at 000040. Later that year, two other doctors concurred in Dr. Fleming's earlier diagnosis. *See id.* Ex. F at 000080–000082 (noting that an examination performed by Dr. James M. Killian revealed that Plaintiff's condition was "compatible with a moderately severe sensorimotor polyneuropathy"); *id.* Ex. G at 000005 (indicating in a report drafted by Dr. Richard M. Armstrong that Plaintiff's

"exam is consistent with a chronic demyelinating peripheral motor sensory neuropathy" and noting that "[t]reatment of the patient's chronic demyelinating polyneuropathy which is a probable diagnosis was discussed with patient").

In 1995, doctors continued to inform Plaintiff that he likely was suffering from CIDP. *See id.* Ex. G at 000006 (noting in a report written by Dr. Armstrong on January 3, 1995 that "Mr. Dolling returns for further discussion of his neuropathy which is presumed to be chronic inflammatory demyelinating polyneuropathy"); *id.* Ex C at 000013, 000044 (relating in two reports written by Dr. Fleming on January 24, 1995 that "Mr. Dolling tells me that Dr. Armstrong has told him that he as axonal neuropathy," and concluding once again that "I continue to believe that Mr. Dolling has a generalized peripheral neuropathy of undetermined etiology. I suspect that he most likely has chronic inflammatory demyelinating neuropathy."); *id.* Ex. F at 000002–000003 (observing in roughly outlined notes taken by Dr. J. Martin Barrash on February 7, 1995 that Plaintiff "saw Dr. Armstrong [who told him he] had chronic inflammatory demyelinating neuropathy"); *id* at 000006–000007 (revealing in a February 7, 1995 letter written by Dr. Barrash to Plaintiff's employer at the time that "I do not believe that Mr. Dolling should be on a seagoing vessel. With the profound deficits neurologically from the demyelinating process, the position of his feet is very tenuous."); *id.* Ex. C at 000047 (commenting in a letter written by Dr. Armstrong to Mr. Dolling's employer at the time, dated February 17, 1995, that "Mr. Dolling has a demyelinating peripheral neuropathy of undetermined etiology. It is my opinion that this patient most likely has chronic inflammatory demyelinating neuropathy.").

The next year, doctors reiterated the previous diagnoses that Plaintiff likely had CIDP. *See id.* Ex. H at 000026 (finding in notes drafted by Dr. Wesley Dennis and Karen Rasmussen on July 19, 1996 that

"[i]n May of 1996, the patient saw Dr. Charles Popanee, who is a local neurologist, who diagnosed the patient with CIDP based upon prior EMG and nerve conduction tests"); *id.* at 000026–000027 (confirming in notes written by Drs. Wesley and Rasmussen that Plaintiff "was [diagnosed with] CIDP in Houston in 1994"). Taken together, Plaintiff visited at least six different doctors over the span of three years. Each suspected CIDP and two even went so far as to write letters to Plaintiff's employer recommending that Plaintiff no longer work as a seaman because of his medical condition. For Plaintiff to claim that he was completely unaware that he had medical problems linked to the functioning of his legs is absolutely preposterous—for even Plaintiff admits that he noticed an "injury" more than three years prior to filing suit. *See id.* Ex. B at 62–63, 84, 127–29, 131–32, 149–50 (admitting in deposition that his condition began to manifest itself in 1991 or 1992, that it became quite noticeable by late 1993 or early 1994, and that doctors told him they believed he had CIDP by July 1994). Ultimately, this mountain of evidence establishes that Plaintiff was, at the very least, put on notice as to his condition, because the accumulated effects of the petroleum vapors had indeed manifested themselves by early 1996—more than three years prior to the filing of Plaintiff's suit.

2. *When Did Plaintiff Discover the Alleged Cause of His Medical Condition?*

By 1995, Plaintiff also had formed the belief that his exposure to petroleum vapors had caused the loss of function to nerves in his legs. *See id.* at 128–29, 151–58. Plaintiff's suspicions remained so strong that he openly discussed this causal link with his physicians. *See id.* Ex. C at 000011 (noting in a written report prepared by Dr. Fleming on July 7, 1994 that Plaintiff told him that he had been exposed to organic solvents, but concluding that the

etiology of Plaintiff's condition was undetermined); *id.* at 000029 (advising in a letter written on July 10, 1994 by Dr. Fleming to Plaintiff's employer, Martin Marietta Government, that Plaintiff had told him that he had a history of working around organic solvents, which could be an etiology of his condition); *id.* at 000047 (observing in a letter written to LaMorte, Burns and Company by Dr. Fleming on February 17, 1994 that Plaintiff's CIDP "may have been caused by exposure to organic solvent fumes"); *id.* Ex. H at 000002 (reporting that after Drs. Dennis and Rasmussen examined Plaintiff, he indicated to them "that he was exposed to a lot of petrochemical agents several years ago, back in the late 1980's, which he attributes to some of his symptoms"). Even Plaintiff's current treating physician has noted that Plaintiff admitted to him that "[s]omewhere in late 1989, into 1990 and 1991, [he] became aware of gradually progressive weakness which temporally followed his exposure to numerous petroleum products.... [H]is exposure was significant, with numerous detailed accountings of exposures in which inhalation or direct exposure to vapor occurred." *Id.* Ex. I at 000001–000002. But perhaps the strongest evidence supporting Defendants' claim that Plaintiff had affirmatively associated his contraction of CIDP with exposure to petroleum products comes from a March 24, 1995 letter Plaintiff wrote to Martin Marietta:

> ... [A] polyneuropathy such as mine didn't suddenly just spring up a few days before I eventually came to you in May or June of last year....

> The above is exactly the truth and is all that Martin Marietta ... needs to favorably process my claim. *My personal belief that chronic, massive breathing of petroleum vapors may have contributed to this* is quite unrelated to this claim [Plaintiff was attempting to qualify for long-term disability insurance] and this firm.

> Under the circumstances the most wonderful gift for my survival beyond this juncture is Part C of the attached form filled out to reflect the *overwhelming likelihood or near certainty that my neurological problem was already affecting my system back in January of 1994* when I became aware that my walking was tortoise slow alongside my septuagenarian mother.

> ... As pinched nerves from my handling heavy boxes appears not to be the cause of my condition, Martin Marietta/Lockheed can only help me survive against the long term disability insurance program alone.

*Id.* at 000046 (emphases added). This letter, by itself, establishes Plaintiff's knowledge of an injury and its cause.

Based on this evidence, the Court finds that Plaintiff possessed or, at the very least, had a reasonable opportunity to discover the critical facts surrounding the cause of the injury he claims to have suffered. Dr. Obenour's 1998 opinion that Plaintiff's complaints were the result of exposure to irritant fumes merely confirms Plaintiff's own beliefs and reiterates the diagnoses Plaintiff received from his six previous physicians. *See Clay,* 828 F.2d at 1107. Equally important is the fact that none of the doctors rejected Plaintiff's suspicions that his condition was related to his exposure to petroleum. Hence, even in the absence of firm diagnoses from physicians regarding the cause of Plaintiff's CIDP, the Court finds that by 1995 Plaintiff's symptoms were sufficient to make him aware that his physical injuries likely resulted from exposure to petroleum-based vapors. *See Vaught v. Showa Denko K.K.,* 107 F.3d 1137, 1142 (5th Cir.1997) ("The discovery rule operates to trigger the statute of limitations once a plaintiff has the requisite knowledge, *regardless of whether or how the plaintiff is advised by the medical community.*" (emphasis added)).

In response, Plaintiff relies on *Taurel v. Central Gulf Lines, Inc.,* 947 F.2d 769 (5th Cir.1991), for the proposition that Plain-

tiff's subjective beliefs are irrelevant in so far as determining the causal connection between CIDP and Plaintiff's exposure to petroleum fumes while working for Defendants.[2] In *Taurel*, the Fifth Circuit ruled that although "fellow seamen and a doctor told [the plaintiff] that exposure to asbestos might have caused his condition[,][n]either of these conversations demonstrates that [Plaintiff] knew, or should have known, that asbestos was more likely responsible for his problems that other potential causes." *Id.* at 771. The Fifth Circuit concluded that whether the plaintiff discovered, or should have discovered that he had asbestosis within three years of commencing his suit was a fact question for the jury; it thereby overturned the special master's finding that the plaintiff should have known six years before he even underwent asbestosis screening that his health problems were asbestos-related. *Id.*

*Taurel* is distinguishable from the case at bar, for Plaintiff Dolling does not face such a precarious situation. Prior to being tested for abstestiosis, the plaintiff in *Taurel* had not formed an independent belief about causation, nor had he received any valid medical opinion suggesting that he might be suffering from asbestosis. *See Taurel*, 947 F.2d at 772 (noting that the one doctor's oral reference to asbestosis made six years before the plaintiff underwent testing amounted to nothing more than "rank speculation"). Here, Plaintiff admits "that at some time between late June 1994 and January 24, 1995, [he] learned [from his doctors] that he had a neuropathy that was a separate and distinct condition from his prior lower extremity injuries and back injury." *Pl.'s Resp. to Defs.' Mot. for Summ.J. at 11.* And, unlike the plaintiff in *Taurel*, Mr. Dolling continued to attribute his condition to his exposure to petroleum vapors based on the findings of his doctors who, using valid medical testing, could not produce evidence disproving such a causal connection.[3] Plaintiff's doctors did not simply make a speculative oral reference regarding the cause of Plaintiff's condition. *See Taurel*, 947 F.2d at 772 (noting that the plaintiff's doctors either failed to include a diagnosis of asbestosis in the plaintiff's medical records or that the x-rays taken did not reveal findings consistent with asbestosis). In fact, the extensive tests conducted by Plaintiff's medical specialists revealed as early as 1994 and 1995 that a connection may, in fact, exist between his condition and his exposure. Thus, Drs. Armstrong, Barrash, Dennis, Fleming, Harati, Killian, and Rasmussen—all of whom at least suspected that Plaintiff's exposure to petroleum may have caused his CIDP—were not merely issuing unsubstantiated declarations regarding the cause of Plaintiff's illness; rather, they had evidence to support their observations. Given these distinctions, the Court declines to broadly construe the holding of *Taurel* so as to embrace Plaintiff's position. Instead, the Court relies on other Fifth Circuit

---

2. Basically, Plaintiff alleges that until he can affirmatively prove causation, the statute of limitations should not begin to accrue. This extension of the discovery rule, however, has been short-circuited by the Supreme Court in *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). In applying the discovery rule to a medical malpractice claim, the Court noted that a plaintiff does not have to await discovery of all elements of a cause of action. The statute of limitations accrues when the plaintiff discovers or should have discovered the "critical facts" of injury and cause, even if the plaintiff remains unaware that the defendant's conduct constitutes negligence. *Id.* at 121–23,

100 S.Ct. at 359–60. Here, Plaintiff is not being charged with the "unknown or inherently unknowable." Instead, he was aware in 1995 of the essential facts relating to his injury and its cause. To excuse him for failure to file earlier by postponing the accrual of his claim would undermine the purpose of the statute of limitations, which is to require the reasonably diligent presentation of tort claims.

3. By 1995, Plaintiff was actively blaming Defendants for his condition. For Plaintiff to suggest that at that time he was not aware of causative factors is preposterous.

opinions more directly on point. *See Porterfield v. Ethicon*, 183 F.3d 464, 467 (5th Cir.1999) (stating that "[t]here is no requirement that [plaintiff] have actual knowledge of the particulars of the cause of action" and rejecting the plaintiff's theory that she could not have reasonably discovered her cause of action until surgeons actually validated her theory of injury and its cause (citing *Vaught*, 107 F.3d at 1141–42)); *Vaught*, 107 F.3d at 1141 ("It is undisputed that, in April 1990, Janet Vaught made a connection between her physical symptoms, EMS, and the ingestion of L-tryptophan. That knowledge was sufficient in *Bell* to trigger the discovery period; it has the same legal effect here."); *see also Bell v. Showa Denko K.K.*, 899 S.W.2d 749, 755 (Tex.App.—Amarillo 1995, writ denied) (concluding that a plaintiff had "knowledge" of her injury when she "associated" her symptoms with the ingestion of L-tryptophan).

Had Plaintiff not developed the theory of causation that he discussed with his physicians and that he utilized in an attempt to receive disability compensation, and had all of his doctors rejected his theory out of hand, the protections employed by the court in *Taurel* might apply. But that is simply not the case here. Consequently, the Court finds that Plaintiff "knew, or should have known, that [petroleum fumes were] more likely responsible for his problem than other potential causes." *Id.* at 771.[4]

In clinging to the idea that the limitations period should not accrue until his suspicions concerning cause of injury were corroborated by medical opinion, Plaintiff also turns to a Seventh Circuit case, *Stoleson v. United States*, 629 F.2d 1265 (7th Cir.1980). Plaintiff's reliance on *Stoleson*, while not controlling on the Court, is nevertheless misplaced. That case involved a plaintiff who was told by her treating physicians that her theory of causation (exposure to nitroglycerin) was "groundless," although her suspicions later proved correct. *Id.* at 1267. Because doctors had originally told Plaintiff that her cardiovascular problems were not connected to exposure to nitroglycerin, the court reasoned that the limitations period should not begin until the proper causal connection could be made. *Id.* In so doing, the court appeared to be protecting a plaintiff's ability to pursue personal injury claims when, through no fault of her own, physicians incorrectly reject a theory of causation posed by that plaintiff.

In this case, Plaintiff requires no such protection. None of the doctors who examined Plaintiff rejected his theory of causation, nor did they conclude that the cause was absolutely unknown; in fact, the doctors recognized a potential connection between Plaintiff's condition and his exposure to petroleum vapors. Therefore, unlike the plaintiff in *Stoleson*, Mr. Dolling was not "a prisoner within the walls of medical science"—corroborating medical evidence supported Plaintiff's theory of causation. *Id.* at 1270. Moreover, in contrast to the circumstances encountered by the plaintiff in *Stoleson*, Mr. Dolling does not fall into the category of persons "who

---

4. Plaintiff stresses that "competent physicians of average training and knowledge, including neurologist, would not have been able to advise Dolling that his occupational exposure to petroleum vapor was the cause of his neuropathy, until less than three years before suit was filed." *Pl.'s Resp. to Defs.' Mot. for Summ.J. at 15.* For support, Plaintiff relies on the affidavit of Dr. Steven Inbody. *See* Inbody Aff. ¶ 8 (noting that it has only been in the past "12–18 months that medical science has recognized that neuro-toxic insult that results in damage to the nerve myelin, such as exposure to petroleum products and their va-

pors, can initiate an immune response that results in chronic demyelination"). In response, Defendants challenge the reliability of Dr. Steven Inbody's affidavit, claiming that it is inadmissible as competent expert testimony. Because of Plaintiff's admissions regarding liability, the Court need not reach the merits of Defendants' objections. Plaintiff had knowledge of his injury and its cause (indeed he actively promoted the fact that his injury and its cause were connected to his exposure to petroleum fumes), Dr. Inbody's affidavit notwithstanding.

is blamelessly ignorant of the existence or cause of his injury." *Id.* at 1269. Given the factual discrepancies between *Stoleson* and this case, the Court declines to rely on it for the purposes advocated by Plaintiff.

Having addressed the salient issues raised by both parties, the Court concludes that Plaintiff had long associated his medical condition to his exposure to petroleum vapors. Therefore, the Court finds that, based on the evidence presented, Plaintiff had enough knowledge surrounding his injury and its source to assert a cause of action by 1995. The Court deems that by that year Plaintiff knew or should have known that his injuries could be attributed to his exposure to petroleum fumes aboard Defendants' vessels. Therefore, Plaintiff's claims are barred by the three-year statute of limitations. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED.**

## III. CONCLUSION

The Court holds that Plaintiff either possessed or had a reasonable opportunity to discover the critical facts of his injury and its cause by 1995. All of Plaintiff's claims accrued at that time and consequently are barred by the applicable three-year statute of limitations. Defendants therefore are entitled to judgment as a matter of law. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED.**

The parties are **ORDERED** to file no further pleadings on these issues in this Court, including motions to reconsider and the like, unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**THIS IS A FINAL JUDGMENT.**

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

For the reasons set forth in the Court's Order entered this date, Defendants' Motion for Summary Judgment is hereby **GRANTED** and Judgment is entered for Defendants. All parties are **ORDERED** to bear their own costs and attorney's fees incurred herein to date.

**THIS IS A FINAL JUDGMENT.**

**IT IS SO ORDERED.**