IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-40113
_____


MARGARET WINTERS,

                                        Plaintiff-Appellant,

                        versus

DIAMOND SHAMROCK CHEMICAL COMPANY; ET AL.,

                                        Defendants,

THE DOW CHEMICAL COMPANY; MONSANTO
COMPANY; UNIROYAL, INCORPORATED;
HERCULES, INC.; THOMPSON-HAYWARD
CHEMICAL COMPANY, also known as
Thompson Chemical Corporation;
T H AGRICULTURE & NUTRITION COMPANY,
INC.; DIAMOND SHAMROCK CHEMICAL COMPANY,

                                        Defendants-Appellees.
_____

Appeal from the United District Court for the
Eastern District of Texas
_____
August 17, 1998

Before GARWOOD, JOLLY, and HIGGINBOTHAM, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

        This case is part of the Agent Orange saga.  This particular
appeal presents a question regarding the reach of the offensive
collateral estoppel doctrine where the issue sought to be precluded
from relitigation was decided in a trial court outside this circuit
and the foreign court's decision was not subjected to appellate
review.  We hold today that the district court properly denied such
a judgment preclusive effect under the collateral estoppel

doctrine, that we do indeed have jurisdiction under the Federal Officer Removal Statute, and that we therefore may reach the merits of this appeal.  In so doing, we affirm the judgment of the district court dismissing the complaint as barred by the Texas statute of limitations.

I

The defendants supplied the American government with Agent Orange between 1962 and 1971.  Agent Orange is an equally mixed herbicidal blend of 2,4-Dichlorophenoxyacetic Acid (2,4-D) and 2,4,5-Trichlorophenoxyacetic Acid (2,4,5-T).  The blending production of these two acids can produce varying amounts of 2,3,7,8 Tetrachlorodibenzo-p-dioxin, an extremely toxic substance. The voluminous lawsuits involving Agent Orange, including this one, center around the physical defects and diseases allegedly caused by exposure to this dioxin.

Margaret Winters, now taken from this world by the disease allegedly caused by Agent Orange, worked as a civilian nurse for the United States Agency for International Development ("U.S.AID") in Vietnam in 1966 and 1967.  During her 14-month overseas tenure, Winters lived in Saigon and worked at a hospital located in Cholon, a suburb of Saigon.  While Winters was living in Vietnam, the American government employed the herbicide Agent Orange as a defoliator, in order to provide its military personnel with some tactical advantage.

2

Winters returned to Chicago in October 1967. Nearly ten years later, she began to experience health problems. Specifically, her eyes hemorrhaged and, in 1981, tumors were discovered behind both of them. She was diagnosed in August 1983 with non-Hodgkin's lymphoma ("NHL"). Winters filed suit ten years later after reading an article in the local newspaper reporting a link between NHL and Agent Orange. She alleged that the defendants formulated, manufactured, and sold Agent Orange to the United States military, that the herbicide was defective and unreasonably dangerous, that she was exposed to Agent Orange while in Vietnam, and that the herbicide caused her usually-terminal cancer. During the pendency of this action, Winters succumbed to the disease and the torch was passed to her estate.[1]

II

The defendants removed the state-filed action to federal court in the Eastern District of Texas pursuant to both the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1), and the court's original jurisdiction, premised on the federal law governing military procurements, 28 U.S.C. § 1331. The Judicial Panel on Multidistrict Litigation determined that Winters's suit was sufficiently similar to others decided by Judge Jack Weinstein in the Eastern District of New York and transferred the action to that district. Winters filed a motion to remand the case to state

_____

[1]For uniformity, we refer to the plaintiff as "Winters" throughout the opinion.

court, alleging that the defendants' asserted grounds for removal were defective. Judge Weinstein, professing a lack of expertise with Texas substantive law, transferred the case back to the Eastern District of Texas.

The Texas district court denied Winters's motion to remand on the basis that the defendants sufficiently demonstrated that they were entitled to a federal forum under the Federal Officer Removal Statute. The defendants then moved for a judgment as a matter of law, arguing that they were entitled to a judgment on the basis of the military contractor defense and laches. The court granted summary judgment for the defendants on statute-of-limitations grounds without having received a response from Winters. Winters then filed a motion for a new trial and/or rehearing and submitted evidence in support of that motion. The district court declined to reconsider its ruling and Winters timely appealed.

III

Winters initially argues that the district court erred when it refused to offensively apply the doctrine of collateral estoppel to preclude the defendants from arguing that the case was properly removed from state court. She maintains that the defendants had a full and fair opportunity to argue their position in Ryan v. Dow Chem. Co., et al.[2] and that the Ryan Court's decision to remand

---

[2]781 F.Supp. 934 (E.D.N.Y. 1992).

4

should have preclusive effect against the defendants in the present action.

A

The seminal case setting out the parameters of the *offensive* use of collateral estoppel is <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 99 S.Ct. 645 (1979). Before addressing <u>Parklane</u>, however, let us make a few observations generally about the use of collateral estoppel, or issue preclusion. Four conditions must be met before collateral estoppel may be applied to bar relitigation of an issue previously decided by a court of competent jurisdiction:

> (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine.

<u>Copeland, et al. v. Merrill Lynch & Co., et al.</u>, 47 F.3d 1415, 1422 (5th Cir. 1995) (citing <u>United States v. Shanbaum</u>, 10 F.3d 305, 311 (5th Cir. 1994)).[3]

---

[3]In addition to those four factors, we have set out a few other safeguards that must be present before estoppel may be employed. One such safeguard is a requirement that the "facts and the legal standard used to assess them are the same in both proceedings." <u>Copeland</u>, 47 F.3d at 1422. A second involves an inquiry into whether a "'new determination of the issue is warranted by differences in the quality or extensiveness of the procedure followed in the two courts.'" <u>Id.</u> at 1423 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 28(3)). Third, unless the issue sought to be precluded from relitigation was a "critical and necessary part" integral to the prior judgment, collateral estoppel may not apply. <u>Id.</u>

5

As noted above, the fourth factor pertinent to application of the collateral estoppel doctrine is whether any "special circumstances" exist that would make issue preclusion unfair. The Supreme Court, in Parklane, set out examples of such "special circumstances" when application is sought offensively. One is whether the plaintiff easily could have joined the previous action, but instead chose to "wait and see" whether a favorable judgment would be rendered. Parklane, 439 U.S. at 330-31; 99 S.Ct. at 651-52. A second consideration is whether the defendant had the incentive to defend vigorously, especially if sued only for nominal damages or if future suits were not foreseeable. Id. Third, offensive collateral estoppel asks whether the judgment upon which the plaintiff seeks to rely is itself inconsistent with a previous judgment in favor of the defendant. Id.

"The general rule should be that in cases . . . where, either for the reasons discussed above *or for other reasons*, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." Id. at 331 (emphasis added). The Court specifically noted, however, that a district court has *broad* discretion to determine whether collateral estoppel is appropriately employed offensively to preclude issue relitigation. Id. at 331; Copeland, 47 F.3d at 1423 (also noting "broad discretion" of district court, particularly with respect to use of offensive collateral estoppel). We thus review the district court's refusal to offensively apply

6

collateral estoppel only for abuse of the broad discretion afforded it. Copeland, 47 F.3d at 1423.

With this general understanding of offensive collateral estoppel, we turn to the specifics of this action. The defendants do not dispute that they had adequate incentive and opportunity to fully and fairly litigate this removal question before the district court in New York. Furthermore, no special procedures inured to their benefit in the action before the Texas court that did not equally apply to the case before the New York court. The removal issue litigated in New York was identical to that litigated in Texas and was integrally related to--indeed, it constituted the crux of--the particular judgment. With all concrete factors, then, being in favor of applying offensive collateral estoppel, we consider whether any "special circumstances" exist that make the application inappropriate.

B

Judge Weinstein, in Ryan, considered and rejected the defendants' argument that the Federal Officer Removal Statute provided the federal court with removal jurisdiction. 781 F.Supp. at 944-51. The district court then remanded the action to state court, but characterized its ruling on § 1442 as "close" and certified its decision for interlocutory review. Id. at 953. The Second Circuit dismissed the interlocutory appeal for lack of

7

appellate jurisdiction over a remand order.[4]  Thus, no reviewing court was ever able to determine the correctness of Judge Weinstein's ruling on this matter--a ruling which Judge Weinstein recognized as close, and indeed so uncertain that he certified it for appeal.

The appeal before us thus presents a question concerning the propriety of applying collateral estoppel offensively to a jurisdictional determination--i.e., a remand order--that was not legally capable of appellate review.  In the absence of specific precedent, we will look for guidance in other type cases in which the absence of appellate review has been a factor in barring the use of offensive collateral estoppel.  See Matter of Schwager, 121 F.3d 177, 183-84 (5th Cir. 1997); cf. Hicks v. Quaker Oats Co., 662 F.2d 1158, 1168-73 (5th Cir. Unit A 1981) (refusing to afford unappealed alternate grounds of decision offensive collateral estoppel effect).

In Schwager, the bankruptcy court had applied the doctrine of offensive collateral estoppel to the jury's factual findings in the underlying state court judgment.  With relitigation of those facts precluded, the bankruptcy court had determined that Schwager's debt was nondischargeable.  On appeal, Schwager argued that collateral estoppel was improper because the state jury's findings had been in

---

[4]Ryan, No. 92-8008 (2d Cir. April 15, 1992) (denying petition for 1292(b) review); Ryan, No. 92-8008 (2d Cir. May 22, 1992) (denying motion for reconsideration); Ryan, No. 92-7487 (2d Cir. June 16, 1992) (dismissing appeal).

the conjunctive, which made it impossible to determine the basis of the jury's determination of Schwager's debt.  Schwager, 121 F.3d at 182-83.

Because the underlying judgment was that of a state court, the Schwager Court looked to Texas law to determine the proper application of the estoppel doctrine.  Id. at 181 (citing Garner v. Lehrer (In re Garner), 56 F.3d 677, 679 & n.2 (5th Cir. 1995) (citing 28 U.S.C. § 1738)).  Texas courts apply the Restatement (Second) of Judgments § 27[5] as their general rule of issue preclusion.  Id. at 183 (citing Gober v. Terra + Corp. (In re Gober), 100 F.3d 1195, 1203 n.6 (5th Cir. 1996)).  Comment i to the Restatement provides

> *i. Alternative determinations by court of first instance.*
> If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone.

Comment O, however, elaborates further on the situation presented in comment i:

> If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result, and the appellate court upholds both of these determinations as sufficient and accordingly affirms the

---

[5]Section 27 provides:
When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

judgment, the judgment is conclusive as to both determinations. In contrast to the case discussed in Comment i, the losing party has here obtained an appellate decision on the issue, and thus the balance weighs in favor of preclusion.

Texas courts had yet to address comment O, and the Schwager Court turned to federal circuit cases for guidance in its application. 121 F.3d at 183. The court reasoned that comment O allowed for issue preclusion only when the appellate court had considered the *specific* issue sought to be barred from relitigation by collateral estoppel. Id. at 183-84 (citing Arab African Int'l Bank v. Epstein, 958 F.2d 532, 537 (3d Cir. 1992); (Hicks v. Quaker Oats Co., 662 F.2d 1158, 1168 (5th Cir. Unit A Dec. 1981)). Because the state appellate court had not passed on the specific issue that the bankruptcy court had estopped Schwager from relitigating, the Schwager Court determined that the doctrine's application was erroneous. Id. at 184. The Schwager Court so held even though lack of review by the state appellate court was occasioned by Schwager himself. The state court had provided Schwager with no less than three opportunities to properly brief his appeal. 121 F.3d at 184. When Schwager declined to comply the third time, the state court struck the majority of his points of error, including the issues sought to be precluded from relitigation. Id. It is important to note then that the Schwager Court disallowed issue preclusion solely on the premise that the state appellate court had not specifically passed on the specific

10

issues--even though Schwager's actions directly had contributed to that absence of review.

The court in Hicks v. Quaker Oats Co. faced a somewhat analogous situation and made a similar ruling. 662 F.2d 1158 (5th Cir. Unit A Dec. 1981).[6] The district court in Hicks applied collateral estoppel to two issues--reliance and promissory estoppel--that had been decided adversely to the defendants in a previous litigation before the same district judge. We determined that application of the doctrine was erroneous for several reasons. One, which is of particular relevance to our case today, was that the district court had relied on a determination that had been subject to no appellate review.

The Hicks Court further noted that special concerns with collateral estoppel are raised when it is used offensively, especially "where plaintiffs are relying on an alternative ground of decision of a court of *first* instance." Id. at 1170-71 (emphasis added). We particularly stressed the great importance of fairness considerations when determining whether offensive estoppel should be allowed. "Although the decision to apply offensive collateral estoppel rests in the discretion of the trial judge, . . . this discretion is not unbounded and must be channeled through the consideration of fairness listed in Parklane, along

---

[6]We note, as did the Hicks Court, that federal law of issue preclusion applied because the prior decision had been issued by a federal court, albeit in a diversity action. 662 F.2d at 1166. For the same reason, federal law applies to the instant case.

with any other considerations of fairness which the trial judge deems appropriate." Id. at 1172-73 (noting Parklane's factors were not exhaustive).

The Hicks Court stopped short of applying to all cases the proposed Restatement rule that denies estoppel effect to unappealed alternative grounds of decision. Id. at 1173 (referring to Restatement (Second) of Judgments § 68, comment I (Tent. Draft No. 4, April 15, 1977) (now at § 27, comment i)). It did, however, "hold that such a rule is especially appropriate in the case of offensive collateral estoppel, where the problems of assuring a rigorous determination of all grounds of decision are magnified." Id. In the light of all the concerns involved, the court reversed the district court's application of offensive collateral estoppel.

We have since adhered to the Hicks decision disallowing offensive collateral estoppel effect to an alternative ground left unaddressed by the appellate court. See Dow Chemical v. U.S. E.P.A., 832 F.2d 319, 323 (5th Cir. 1987); Breen v. Centex Corp., 695 F.2d 907, 915-16 (5th Cir. 1983). In Dow Chemical, Dow had argued that we should not give estoppel effect to the issue in question because we had affirmed the district court's earlier judgment on other grounds. We agreed and followed Hicks, refusing to depart from the accepted rule that "once an appellate court has affirmed on one ground and passed over another, preclusion does not attach to the ground omitted from its decision." Dow Chemical, 832 F.2d at 323. We explained the rationale for the rule as a response

to concerns that an appellate court's choice of grounds on which to base its decision could "arbitrarily and unfairly preclude any review of alternative grounds reached by the district court." Id. n.25. Furthermore, we applied the rule in Dow Chemical to bar estoppel even though Dow itself had sought to prevent review of the disputed issue in the earlier action. Id.

C

An element obviously common to each of the cases is the unreviewed nature of the issue sought to be precluded from relitigation. In Schwager, Hicks, and Dow Chemical, an appellate court never passed on the validity of the underlying resolution of the specific issue (or issues) whose relitigation another party later sought to bar. The reasoning for rejecting estoppel in those cases appears for the most part to hinge on the lack of incentive that the losing litigant has to appeal the erroneous ground from a judgment premised on alternative grounds.[7]

Indeed, the Restatement notes that it is of "critical importance" that the "losing party, although entitled to appeal

---

[7]None of the cases, however, contemplated that the parties lacked any incentive to litigate the issue before the court of first instance. Presumably, the issue sought to be precluded in a later case had been subjected to a thorough vetting at the time it was first tried. The appellate court simply either never had--as in Hicks where the losing litigant did not appeal the earlier decision--or did not take advantage of--as in Schwager and Dow Chemical where the appellate court affirmed on other grounds--the opportunity to pass on the propriety of the issue's resolution. Implicit in each holding, then, is a requirement of appellate review.

13

from both determinations, might be dissuaded from doing so because of the likelihood that at least one of them would be upheld and the other not even reached." Restatement (Second) of Judgments § 27, comment i; see also Hicks, 662 F.2d at 1171. Comment O, which allows for preclusion when alternative determinations have each been appealed and decided, points out that "the balance weighs in favor of preclusion . . . [because] the losing party has here obtained an appellate decision on the issue." Restatement (Second) of Judgments § 27, comment O (noting conclusiveness attaches only to issue directly addressed by appellate court).

The rationale behind the Restatement focuses on the fairness factor set out by Parklane. Section 27 states that relitigation of an issue will be precluded in a later action if the issue was actually litigated and its determination essential to the judgment. In such a straightforward situation, the losing litigant has ample incentive to appeal the adverse ruling and sufficient notice that it will be bound to that determination in subsequent actions. Thus, allowing issue preclusion under these circumstances is considered fair. In contrast, when a judgment is premised on alternative grounds, the losing litigant is said to lack that full incentive to appeal, thus rendering it unfair to bind him to either unappealed determination. Still further, we have applied this alternative grounds rule even where the failure of the appellate court to address the specific issue resulted because the losing

14

litigant sought to prevent its review.[8] <u>Dow Chemical</u>, 832 F.2d at 323 n.25.

On a continuum from the most fair to the least fair (depending on the incentive of the losing party to appeal the judgment of the court of first instance), the situation in which it is most fair to apply offensive collateral estoppel effect is when the determination of the first case rests on a single issue, thus providing the losing party ample opportunity and incentive to appeal. Next on the continuum of fairness is the determination based on alternative and independent grounds, a situation which, as a rule, does not merit preclusion because of the lack of incentive the losing party has to appeal, i.e., its inherent "unfairness." This rule holds true even when the losing party *can* appeal; he simply lacks incentive to do so. As the continuum diminishes in fairness, the next situation is the case before us: where the losing litigant never had an opportunity to appeal. It is clear that fairness considerations weigh heavily against binding a party whose ability to appeal is precluded by a prohibition of law.

Indeed, the Restatement itself specifically provides for an exception to preclusion when "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of

---

[8]<u>See</u> Restatement (Second) of Judgments § 27, comment i (noting non-preclusion rule of judgments premised on alternative grounds should be applied uniformly despite case specific considerations weighing in favor of preclusion).

the judgment in the initial action."[9]  Restatement (Second) of Judgments § 28(1).  The comment to that subsection notes that "the availability of review for the correction of errors has become critical to the application of [the] preclusion doctrine." Restatement (Second) of Judgments § 28(1), comment a; see also 18 Wright, Miller, & Cooper, Federal Practice & Procedure § 4421 at 203 (1981).

We thus see that the availability of review is of paramount importance to the issue of preclusion.  In Avondale Shipyards, Inc. v. Insured Lloyd's, 786 F.2d 1265 (5th Cir. 1986), we discussed whether preclusive effect should be given to an order granting partial summary judgment.  We noted that the order was nonfinal and thus could be revised by the district court, but we premised our decision refusing to grant preclusive effect to the partial summary judgment order on the basis that it was unappealable.  Avondale, 786 F.2d at 1270.  We noted that we were unaware of "any federal appellate decision which has applied preclusion to a prior nonfinal ruling as to which appellate review was unavailable . . . ."  Id. & 1271 n.8 (citing Restatement (Second) of Judgments § 28, comment a).  Other circuits have also stressed the importance of appellate review.  See, e.g., Lombardi v. City of El Cajon, 117 F.3d 1117,

_____

[9]We should make the special note that this section of the Restatement is not limited to *offensive* collateral estoppel, but is applicable to collateral estoppel in general.  Usually, when offensive collateral estoppel is at issue, the restrictions on the use of the doctrine are more stringent, as indeed Parklane makes clear.

1122 (9th Cir. 1997) (quoting Restatement (Second) of Judgments § 28(1)); Johnson v. Watkins, 101 F.3d 792, 795 (2d Cir. 1996); J.R. Clearwater, Inc. v. Ashland Chemical Co., 93 F.3d 176, 179 (5th Cir. 1996); In re DES Litig., 7 F.3d 20, 24 (2d Cir. 1993); Alliance to End Repression v. City of Chicago, 820 F.2d 873, 875 (7th Cir. 1987); Edwards v. Boeing Vertol Co., 750 F.2d 13, 15 (3d Cir. 1984); see Standefer v. United States, 447 U.S. 10, 23 & n.18, 100 S.Ct. 1999, 2007 & n.18 (1980) (noting confidence that initial litigation was substantially correct is often unwarranted in absence of appellate review).

In the light of the reasoning set out above, it would seem appropriate to hold as a matter of law that collateral estoppel may not be applied offensively to a jurisdictional decision--such as one granting a motion to remand--that is not capable of being subjected to appellate review.[10]  Not only would such a legal rule comport with the reasoning of most of our estoppel cases, but it

---

[10]Commentators and case law alike have noted that, while dismissal for lack of jurisdiction does not operate as an adjudication on the merits (see Fed.R.Civ.P. 41(b)), the "judgment is effective to preclude relitigation of the precise issue of jurisdiction . . . that led to the initial dismissal." Hopwood v. Texas, 78 F.3d 932, 961 (5th Cir. 1996) (quoting Wright, Miller & Cooper, Federal Practice & Procedure § 4436, at 338); Deckert v. Wachovia Student Financial Servs., 963 F.2d 816, 819 (5th Cir. 1992); Equitable Trust Co. v. Commodity Futures Trading Comm'n, 669 F.2d 269, 272 (5th Cir. 1982); Acree v. Air Line Pilots Ass'n, 390 F.2d 199, 203 (5th Cir. 1968).  These cases and commentators, however, were not addressing the situation presented by offensive application of collateral estoppel effect to a remand order--a jurisdictional decision subject to no review.  As such, they are not dispositive of the issue before us.

would also comply with the Restatement's admonition that "it is in the interest of predictability and simplicity for the result of nonpreclusion to be uniform."  Restatement (Second) of Judgments § 27, comment i.  The restraining hand of precedent, however, arguably limits our ruling in this case today.[11]  We thus turn to decide simply whether the district court abused its discretion when it declined to estop the defendants from relitigating the issue of federal jurisdiction pursuant to the Federal Officer Removal Statute.  Copeland, 47 F.3d at 1423.

---

[11]The Supreme Court decided in 1894 that unavailability of appellate review alone could not preclude the application of the doctrine of res judicata.  Johnson Steel Street Rail Co. v. Wharton, Jr. & Co., 152 U.S. 252, 261 (1894).  The Court held that the "existence or nonexistence of a right, in either party, to have the judgment in the prior suit re-examined, upon appeal or writ of error, cannot in any case, control [the inquiry into the application of the doctrine or res judicata]."  Id.  See also Napper v. Anderson, Henley, Shields, Bradford & Pritchard, 500 F.2d 634, 635-37 (5th Cir. 1974) (discussing estoppel by judgment and noting that "[a]s between the two federal district courts, the inability to appeal from the order of remand does not permit the issue actually litigated and determined in the federal court in Arkansas to be relitigated in the second action"); Frith v. Blazon-Flexible Flyer, Inc., 512 F.2d 899, 901 (5th Cir. 1975); cf. Standefer v. United States, 447 U.S. 10, 23 & n.18 (1980) (noting that the lack of appellate review "strongly militates against giving an acquittal preclusive effect," but also noting that Court was not suggesting "that the availability of appellate review is always an essential predicate of estoppel").
    We note, however, that the Johnson Steel case, issued in 1894, was a "true" res judicata decision, rendered before nonmutual collateral estoppel was even recognized.  Napper and Frith are also pre-Parklane and involved mutual--not nonmutual offensive--estoppel decisions.   Furthermore, as noted supra note 9, the rules applicable to offensive collateral estoppel generally are more restrictive.

18

As we have iterated, the issue decided by the court in Ryan--that the court lacked subject matter jurisdiction under the Federal Officer Removal Statute--was never reviewed by the Second Circuit. Because it was a remand order under 28 U.S.C. § 1447(d), the court of appeals held itself without jurisdiction to review the decision. It is thus clear that the defendants in Ryan did not contribute to the decision's lack of reviewability. Indeed, they actively sought review. Furthermore, the court in Ryan specifically noted the "closeness of the case" and actually certified the issue for immediate appeal pursuant to 28 U.S.C. § 1292(b). 781 F.Supp. at 952-53.

We cannot say, then, that binding a defendant to a ruling that it could not appeal as a matter of law would be any fairer than binding a defendant to a decision affirmed on grounds unrelated to the preclusive issue or to a decision left unappealed because the determination was based on alternative grounds. See Restatement (Second) of Judgments §§ 27 and 28 and relevant comments; 18 Wright, Miller & Cooper, Federal Practice & Procedure § 4421 (1981 & 1998) (noting as correct outcome in case where preclusion was denied because there was a lack of opportunity to appeal). Considerations of fairness then, as set out in Parklane, dictate that collateral estoppel should not be applied to the Ryan Court's decision. We therefore cannot say that the district court abused

its discretion in refusing to offensively apply collateral estoppel to the issue of subject matter jurisdiction under § 1442.

IV

Winters next argues that the district court erred when it applied the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1), to deny her motion to remand this action to state court. The Federal Officer Removal Statute provides in relevant part:

> (a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).[12]  The district court determined that the defendants (1) were "persons," (2) "acting under color of federal authority" when committing the acts that allegedly led to Winters's injuries, and (3) had asserted a colorable federal defense. Winters, 901 F.Supp. at 1198-1203.  Winters challenges the district court's conclusions as to all three prongs.

A

(1)

We initially note that when faced with a motion to remand, it is the defendant's burden to establish the existence of federal jurisdiction over the controversy.  Vasquez v. Alto Bonito Gravel Plant Corp., 56 F.3d 689, 692 (5th Cir. 1995); Dodson v. Spiliada Maritime Corp., 951 F.2d 40, 42 (5th Cir. 1992); Kidd v. Southwest

---

[12]This section was amended in 1996 to read:
    (a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
        (1)  The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.
28 U.S.C. § 1442(a)(1) (West Supp. 1998) (as amended 1996).  The 1996 amendment overruled the Supreme Court's ruling in 1991 that a federal officer, but not a federal agency, could effect removal pursuant to the statute.  See International Primate Protection League v. Administrators of Tulane Educ. Fund, 500 U.S. 72, 111 S.Ct. 1700 (1991).

21

Airlines Co., 891 F.2d 540, 543 (5th Cir. 1990). The district court determined that the defendants met their burden in this case and we review that decision de novo. Sherrod v. American Airlines, Inc., 132 F.3d 1112, 1117 (5th Cir. 1998); Vasquez, 56 F.3d at 692. This standard of review applies even where the district court makes certain findings of fact in denying the motion to remand. Vasquez, 56 F.3d at 692.

(2)

The Supreme Court has on numerous occasions explained the purposes behind § 1442(a)(1). See Willingham v. Morgan, 395 U.S. 402, 405-07 (1969), for the historical background of the Federal Officer Removal Statute. It consistently has been iterated as a principle of federalism and supremacy that the federal government

> can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection,--if their protection must be left to the action of the State court,--the operations of the general government may at any time be arrested at the will of one of its members.

Willingham, 395 U.S. at 406 (quoting Tennessee v. Davis, 100 U.S. 257, 263 (1880)); see also Mesa v. California, 489 U.S. 121, 126 (1989) (quoting Davis); Arizona v. Manypenny, 451 U.S. 232, 241 n.16 (1981) (same).

In the light of that established precept, the Supreme Court has noted that one of the most important functions of this right of

22

removal is to allow a federal court to determine the validity of an asserted official immunity defense. Willingham, 395 U.S. at 407; see also Manypenny, 451 U.S. at 242 (noting right of removal is "absolute for conduct performed under color of federal office"); State of La. v. Sparks, 978 F.2d 226, 232 (5th Cir. 1992) (noting chief purpose is to "prevent federal officers who simply comply with a federal duty from being punished by a state court for doing so"). Removal pursuant to § 1442(a)(1) is thus meant to "ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties." Manypenny, 451 U.S. at 241; Murray v. Murray, 621 F.2d 103, 106 (5th Cir. 1980) (noting removal statute is "incident of federal supremacy"). Furthermore, this right is not to be frustrated by a grudgingly narrow interpretation of the removal statute. Willingham, 395 U.S. at 407; Manypenny, 451 U.S. at 242 (quoting Willingham); Sparks, 978 F.2d at 232 (noting Supreme Court requirement of liberal interpretation for over two decades).

B

(1)

With this mural of broad brush strokes behind us, we turn to the removal issue presented in this case. The defendants must first demonstrate that they are "persons" within the meaning of the statute. We have previously held that corporate entities qualify as "persons" under § 1442(a)(1). International Primate Protection League, No. 93-3067, at 2 (5th Cir. May 4, 1994) (unpublished

23

opinion).[13]  Winters thus cannot seriously contest the district court's determination of this initial prerequisite in the defendants' favor.  The district court did not err when it held that the defendants met the removal statute's first criteria.

(2)

The second factor necessary for § 1442 removal is a finding that the defendants acted pursuant to a federal officer's directions and that a causal nexus exists between the defendants' actions under color of federal office and the plaintiff's claims. Willingham, 395 U.S. at 409 (citing Maryland v. Soper (No. 1), 270 U.S. 9, 33 (1926)).  We have previously noted the Supreme Court's admonishment that the statute's "color of federal office" requirement is neither "limited" nor "narrow," but should be afforded a broad reading so as not to frustrate the statute's underlying rationale.  Murray, 621 F.2d at 107.  On the other hand, the Court has clarified that the right to removal is not unbounded, and only arises when "a federal interest in the matter" exists. Willingham, 395 U.S. at 406; Mesa, 489 U.S. at 139.  The question we must determine is whether the government specified the composition of Agent Orange so as to supply the causal nexus between the federal officer's directions and the plaintiff's claims.

---

[13]Unpublished opinions issued before January 1, 1996, are precedent.  5th Cir.L.R. 47.5.3.

The district court determined that the Defense Department had contracted with the chemical companies for a specific mixture of herbicides, which eventually became known as Agent Orange. Winters, 901 F.Supp. at 1199-1201 (citing In re Agent Orange Prod. Liab. Litig., 996 F.2d 1425, 1436 (2d Cir. 1993)). The court further found that the defendants were compelled to deliver Agent Orange to the government under threat of criminal sanctions. Id. at 1199. Because of the direct control that the court found the government exercised over the composition and production of Agent Orange, the court found a concomitant "substantial federal interest" at stake in the matter. Id. at 1200-01 (also noting federal interest in procurement costs).

> The welfare of military suppliers is a federal concern that impacts the ability of the federal government to order and obtain military equipment at a reasonable cost. Federal interests are especially implicated where, as in this case, the Defense Department expressly issued detailed and direct orders to the defendants to supply a certain product. The specificity of the order raises this issue to a federal concern subject to removal under section 1442(a)(1).

Id.

Winters contends, however--citing Judge Weinstein's opinion in Ryan for support--that the defendants failed to demonstrate that the government exercised the kind of detailed control over the production and formulation of Agent Orange necessary under § 1442(a)(1) to withstand a motion to remand. In essence, Winters argues that the government provided little direction to the defendants because the government bought Agent Orange as an "off-

25

the-shelf" product. She further contends that no substantial causal nexus exists between the defendants' actions under federal direction--simply providing the government with their product--and her causes of action, i.e., strict liability for a defective and unreasonably dangerous product and failure to provide adequate warnings.

Notwithstanding Winters's arguments, our review of the record convinces us that the district court committed no error when it held that the defendants had satisfied the second criteria for removal pursuant to § 1442(a)(1). The evidence indicates that the government maintained strict control over the development and subsequent production of Agent Orange. For instance, management for defendant Hercules, Inc. offered the following uncontradicted testimony:

> . . . Hercules had manufactured for domestic sale, among other products the n-butyl esters of 2,4-Dichlorophenoxyacetic acid ("2,4-D") and 2,4,5-Trichlorophenoxyacetic acid ("2,4,5-T"), the two component ingredients of "Agent Orange", since approximately 1962. Both the n-butyl esters and other esters and salts of 2,4-D and 2,4,5-T (generally hereinafter referred to as "phenoxy herbicides") had been sold commercially in the United States, separately and in various combinations, as herbicides for many years before Hercules entered into production. *However, Hercules never manufactured or registered "Agent Orange" for domestic use either prior to or after making "Agent Orange" for the Government.*
>
> * * *
>
> The Government required that "Agent Orange" be produced to its specifications set forth in the contracts and documents referenced therein. For example, the first contract specified that "Agent Orange" consist of a 50-

26

50% mixture by volume of the n-butyl esters of 2,4-D and 2,4,5-T with a tolerance under the contract for each ingredient of ± 1.5%. The 2,4-D was required to have an acid purity of a minimum of 98.0% by weight and to contain not more than 0.5% of "free acid" by weight, and the 2,4,5-T was required to have an acid purity of a minimum of 99.0% by weight. . . . Other specifications concerned the packaging, labeling and shipping of "Agent Orange."

* * *

The Government also inspected the labeling of the drums in which "Agent Orange" was shipped. Nothing but what the Government specified was allowed to be placed on the drums. . . . No warning was placed on the containers, and none was permitted by the contract specifications.

Record Volume 1 at 121-123 (March 1980 Aff. of John P. Frawley).

The evidence is substantially similar with respect to the other defendants as well. Each was required to produce and provide to the Department of Defense the herbicidal mixture known as "Agent Orange"--with the specifications for the defoliant (and its packaging) specifically dictated by the government. Although the defendants had produced 2,4-D and 2,4,5-T for commercial use before government involvement, their commercial formulations were never composed of a mixture of 100% pure 2,4-D/ 2,4,5-T, which the government required for the most part (98% for 2,4-D and 99% for 2,4,5-T) in its contracts with the defendants. Instead, the defendants had always included a substantial percentage of inert ingredients to dilute the two active ingredients and required further dilution before commercial application. In contrast, the government's specifications for Agent Orange included use of the

27

two active chemicals in unprecedented quantities for the specific purpose of stripping certain areas of Vietnam of their vegetation. To quickly achieve this goal, the government dictated that Agent Orange contain only the active ingredients 2,4-D and 2,4,5-T and it applied the product in Vietnam without dilution.

The gist of this action centers around the trace elements of dioxin contained in Agent Orange and whether a causal relationship exists between Winters's terminal disease and her alleged exposure to that dioxin. We are convinced that the government's detailed specifications concerning the make-up, packaging, and delivery of Agent Orange, the compulsion to provide the product to the government's specifications, and the on-going supervision the government exercised over the formulation, packaging, and delivery of Agent Orange is all quite sufficient to demonstrate that the defendants acted pursuant to federal direction and that a direct causal nexus exists between the defendants' actions taken under color of federal office and Winters's claims. The defendants have demonstrated the second criteria necessary for federal officers removal.

(3)

The third and final factor necessary for removal pursuant to § 1442 is the assertion of a "colorable federal defense." Willingham, 395 U.S. at 406-07; Manypenny, 451 U.S. at 241 ("[R]emoval under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal

28

official is entitled to raise a defense *arising out of his official duties*."); Mesa, 489 U.S. at 129, 133-34 ("[A]n unbroken line of this Court's decisions extending back nearly a century and a quarter have understood all the various incarnations of the federal officer removal statute to require the averment of a federal defense."). It is important to note that the defendants need not prove the asserted defense, but need only articulate its "colorable" applicability to the plaintiff's claims. "One of the primary purposes of the removal statute--as its history clearly demonstrates--was to have such defenses litigated in the federal courts. . . . In fact, one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court. *The officer need not win his case before he can have it removed*." Willingham, 395 U.S. at 407 (emphasis added). In this case, the defendants have proposed two defenses that they contend meet the removal statute's requirement: (1) the government contract defense, and (2) the immunity afforded them under the Defense Production Act.

(a)

The Supreme Court set out the test for immunity under the government contractor defense in Boyle v. United Techs. Corp., 487 U.S. 500, 512 (1988). The Court wrote that

> [l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the

29

dangers in the use of the equipment that were known to the supplier but not to the United States.

Id. The Court explained that the government's immunity inured to the benefit of the contractor because it was derivative of the government's own immunity from suit "where the performance of a discretionary function is at issue." In re Air Disaster at Ramstein Air Base, Germany, 81 F.3d 570, 574 (5th Cir. 1996) (citing Boyle, 487 U.S. at 511). The Court further noted that "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function." Boyle, 487 U.S. at 511. Thus, the decisions regarding the specific formulation, packaging, delivery, and use of Agent Orange in Vietnam constitute governmental exercise of a discretionary function.

We need not again delve into the specifics contained in the record, as we have done supra, to determine whether the defendants' proffer of the government contractor defense satisfies the third requirement for removal under § 1442; we simply note that the evidence we have earlier described amply supports the defendants' assertion that the specifications for Agent Orange were provided by the government and that the product conformed to those specifications. See Smith v. Xerox Corp., 866 F.2d 135, 138 (5th Cir. 1989) (noting "government contractor defense requires only that the government approve reasonably precise specifications" and that this factor was met where government supplied the relevant

30

specifications).  Furthermore, the Defense Department periodically subjected the defendants to supervisory reviews to determine their compliance with the contractual provisions--ascertaining not only their compliance with the contractual requirements for the herbicidal mixture itself, but also with how it was packaged and transported.[14]  The government did not "merely accept[], without any substantive review or evaluation, decisions" made by the defendants.  Trevino v. General Dynamics Corp., 865 F.2d 1474, 1480 (5th Cir. 1989) (noting the "trier of fact will determine whether the government has exercised or delegated to the contractor discretion over the product design").  Finally, the evidence indicates that the defendants provided the Defense Department with ample warnings concerning the risks of the component parts of Agent Orange, but were specifically prohibited from placing any warnings on the finished product itself except as allowed by contract. Without deciding the merits of the government contractor defense in this case, we certainly deem its assertion sufficiently colorable for § 1442 removal purposes.

(b)

Because we determine that the first proffered defense--the government contractor defense--satisfies the third prong under § 1442 and thus suffices to establish federal court jurisdiction,

---

[14]For instance, one government inspector even demanded that he be allowed to count the barrels of Agent Orange loaded on a train and to survey their arrangement for traveling purposes.

we need not also address in depth the "colorability" of the defendants' assertion of the Defense Production Act[15] as a defense to Winters's claims.  We simply note our agreement in this respect with Judge Weinstein, the "most knowledgeable and informed judge ever with respect to the Agent Orange cases"--according to Winters--who determined that the defendants' assertion of the Defense Production Act as a defense satisfied the removal statute. Ryan, 781 F.Supp. at 945.[16]

For the reasons set out supra, we hold that the district court did not err when it denied Winters's motion to remand.  The defendants demonstrated their right to a federal forum pursuant to § 1442(a)(1).

---

[15]50 U.S.C. App. § 2061 et seq. (1988).  In relevant part, the Defense Production Act provides:
> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act.

Id. § 2157.

[16]Our difference with Judge Weinstein is, for the most part, set out supra in Part IV(B)(2).  Judge Weinstein determined that remand was proper because he found that the defendants had failed to satisfy the second prong of the Federal Officer Removal Statute--that they acted under color of federal office.  Ryan, 781 F.Supp. at 950.  Judge Weinstein, although acknowledging that the case presented a close question, held that the defendants had not demonstrated sufficient government control over the production of Agent Orange because "[t]he government sought only to buy ready-to-order herbicides."  Id.  He found it determinative that the defendants had formulated, produced and commercially sold all of the component parts of Agent Orange, albeit in different compositions, before government involvement.  Id.  Our reading of the record, however, reflects that the alleged deadly properties of Agent Orange resulted from the particular mixture of the component chemicals that the government dictated.

32

V

Having decided that the district court correctly determined its jurisdiction over this matter, we turn to the parties' arguments with respect to the district court's entry of summary judgment. Winters initially contends that the court procedurally erred when it ruled on the defendants' motion for summary judgment without allowing her an adequate opportunity to respond. She also argues that there are fact questions as to when her cause of action accrued and that holding that the statute of limitations had expired was error.

A

We first address the alleged procedural error. The defendants filed their motion for summary judgment on May 28, 1996. That same day, the court entered an order granting Winters until June 7 to furnish it with a letter setting out what discovery she would need to complete before she could respond to the defendants' motion. The court also noted that the "[t]ime to respond to [the] motions for summary judgment is hereby extended until the court's ruling on discovery." Winters complied with the order and supplied the court with a letter requesting six months' time in which to engage in discovery and to respond to the summary judgment motion. Most importantly, however, Winters said that she could respond to the statute of limitations issue within 90 days and she set forth no specific discovery that she needed to conduct with respect to that matter. On September 25, without ruling on Winters's discovery

33

requests and without providing her with notice, the district court granted the defendants' motion for summary judgment on statute of limitations grounds.

The district court's failure to set a reply date to the defendants' pending motion for summary judgment effectively denied Winters an opportunity to respond before the court's ruling. We previously have held that ruling on a motion for summary judgment without providing either notice or a hearing "cut[s] off [a] plaintiff's opportunity to develop a record on which the court could fairly rule on the merits of his complaint" and, thus, constitutes error. Kobort v. Hampton, 538 F.2d 90, 91 (5th Cir. 1976); see also NL Indus., Inc. v. GHR Energy Corp., 940 F.2d 957, 965 (5th Cir. 1991) ("Any reasonable doubts about whether [the non-moving party] received notice that its entire case was at risk must be resolved in favor of [that party]."); Capital Films Corp. v. Charles Fries Prod., 628 F.2d 387, 391-92 (5th Cir. 1980) (holding court abuses discretion when it prematurely rules on a summary judgment motion after inducing a party reasonably to believe that he had additional time in which to respond).

The court's entry of judgment in the defendants' favor without providing the nonmovant with advance notice of its intention to address the dispositive motion, however, does not require reversal in this case. After receiving the court's order, Winters timely filed a motion for new trial or rehearing. She also submitted evidence in support of that motion and the court considered all of

34

her attachments before denying her motion. Because she was afforded an opportunity, albeit after the initial ruling, to present the court with evidence supporting her arguments, the court's error in ruling without providing her an opportunity to respond, may be considered harmless. <u>Resolution Trust v. Sharif-Munir-Davidson Dev. Corp.</u>, 992 F.2d 1398, 1403 (5th Cir. 1993). Because the district court thus rectified its initial procedural error, we may now reach the merits of its decision.

B

The defendants moved for summary judgment on the basis, <u>inter alia</u>, that Winters's claims[17] were barred by the statute of limitations. The district court determined that, under Texas law, Winters's claims accrued by 1986 at the latest. Because she did not file this lawsuit until 1993, the court held that the two-year statute of limitations had long since run. We review an award of summary judgment <u>de novo</u>, using the same standards as applied by a district court. <u>Bailey v. McDonnell Douglas Corp.</u>, 989 F.2d 794, 799 (5th Cir. 1993).

The parties do not contest the application of Texas substantive law to this matter. In Texas, a two-year statute of limitations governs personal injury actions. Tex. (Civ.Prac.& Rem.) Code Ann. § 16.003(a) (Vernon 1986). Claims not brought

---

[17]Winters brought negligence claims, product liability claims, and a breach of implied warranty claim. She has not appealed the district court's resolution of her breach of implied warranty claim.

35

within two years from the date the cause of action accrues are barred. Id.; Schaefer v. Gulf Coast Regional Blood Ctr., 10 F.3d 327, 331 (5th Cir. 1994). A cause of action accrues when the legal wrong is completed and the plaintiff becomes entitled to commence her suit, even if she remains unaware of the injury. Vaught v. Showa Denko K.K., 107 F.3d 1137, 1140 (5th Cir. 1997).

Texas courts, however, have adopted a "discovery rule" that lengthens the time within which a plaintiff may institute suit. Id. (citing Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex. 1990)). Under the discovery rule, the cause of action may accrue for purposes of ripeness when the legal wrong is consummated, but the statute of limitations is tolled until the plaintiff discovers, or through the exercise of reasonable care and diligence should have discovered, the nature of her injury. Swift v. State Farm Life Ins. Co., 129 F.3d 792, 796-97 (5th Cir. 1997); Vaught, 107 F.3d at 1140 (citing Moreno; Willis v. Maverick, 760 S.W.2d 642, 644 (Tex. 1988)); Schaefer, 10 F.3d at 331. "Discovery" does not mean "actual knowledge of the particulars of a cause of action," but whether the plaintiff has "knowledge of facts which would cause a reasonable person to diligently make inquiry to determine his or her legal rights." Vaught, 107 F.3d at 1140, 1141-42. Under this interpretation, the tolling period may expire and the statute of limitations begin to run before a plaintiff subjectively learns the "details of the evidence by which to establish [her] cause of action." Id. at 1140.

36

Winters has alleged that she was exposed to Agent Orange while in Vietnam and that the herbicide caused the NHL with which she positively was diagnosed in August 1983.  Although her cause of action may have accrued no later than October 1967--when she left Vietnam--she maintains that she did not "discover" the facts necessary to inform her of her legal rights against the defendants until she read a newspaper article in 1991 that reported a link between Agent Orange and NHL.[18]  The defendants contend that she should have discovered her cause of action at least by 1986.

The record is replete with numerous newspaper articles and excerpts from television and radio reports dating from 1984--and, indeed, before--that concern Agent Orange and its alleged deleterious effects on veterans who were exposed to it in Vietnam.[19] An overwhelming number of the media publications reported on the

---

[18]The newspaper article was in the Chicago Sun-Times.  It reported that President Bush had signed into law legislation awarding compensation to veterans suffering from NHL who had been exposed to Agent Orange.

[19]See, e.g., "Agent Orange trial jury review begins," Chicago Tribune, May 1, 1984; "7 Agent Orange makers on trial," Chicago Sun-Times, May 7, 1984; Anne Keegan, "Vietnam vets feel robbed of day in court," Chicago Tribune, May 7, 1984, at 1; "Vets pleased with decision," Chicago Calumet, May 8, 1984; Hugh Hough, "Settlement is a 'slap in the face,' Viet vet says," Chicago Sun-Times, May 8, 1984; "Agent Orange makers to pay $180 million," Chicago Sun-Times, May 8, 1984; Bob Olmstead, "Agent Orange accord hit," Chicago Sun-Times, May 11, 1984; Joseph R. Tybor, "Vets accuse lawyers of selling out," Chicago Tribune, May 25, 1984; "This Morning" (ABC television broadcast, May 7, 1984) (news bit concerning Agent Orange); "4:30 Chicago News" (WMAQ-TV(NBC) Channel Five local news) (news bit about settlement and interviews with local vets).  Winters resided in Chicago during the 80s.

veterans' suits brought against the chemical companies and on the $180 million out-of-court settlement reached on May 7, 1984. Almost all of the reports in the mid-80s mention that Agent Orange is alleged to have caused various illnesses, including cancer.

Still another major story that garnered a blitz of media coverage concerned Admiral Elmo Zumwalt's admission that a connection probably existed between Agent Orange and his son's cancer.[20] Admiral Zumwalt had ordered the use of the chemical defoliant in Vietnam while his son served there on a Navy patrol boat. Zumwalt's son discovered in 1983 that he suffered from advanced cancer of the lymph glands; Zumwalt's grandson also was afflicted by a birth defect. Because the story dripped with irony, the media widely reported on both illnesses in the context of their alleged causal relationship with Agent Orange.

Winters testified that she first thought that she might have been exposed to Agent Orange while she had been working as a nurse in Saigon when she read newspaper reports in the 80s of the defoliant's use in Vietnam. She also testified that she may have seen on the news during that same time the publicity about veterans who were suing for cancer that was allegedly caused by Agent Orange. She said, however, that she did not "follow" the reports

---

[20]See, e.g., "Zumwalt haunted by Agent Orange," Chicago Tribune, May 22, 1984; Georgie Anne Geyer, "World's complexity makes U.S. uneasy," Chicago Sun-Times, May 31, 1984.

about the claims and that she never read of any reported link between Agent Orange and NHL until the 1991 article.

Winters testified, however, that she made no effort to gather information as to what may have caused the NHL after her diagnosis in 1983. In fact, she never inquired of the cause of her illness until after she read the 1991 article. The extensive media publicity of the mid-80s, however, should have put Winters on notice that she needed to investigate any possible connection between her cancer--NHL--and her alleged exposure to Agent Orange while in Vietnam. Although she testified that she focused only on the reports of the chemical spraying and not the claims associated with its spraying, she conceded that most reports were made in the conjunctive--discussing the spraying only as it was relevant to the claims. Because most of the media reports also discussed claims that the herbicide caused cancer, among various other illnesses, Winters surely had sufficient knowledge in the mid-80s "of such facts as would cause a reasonably prudent person to make an inquiry that would lead to discovery of the cause of action." Vaught, 107 F.3d at 1140 (quoting Hoover v. Gregory, 835 S.W.2d 668, 671 (Tex.Ct.App. 1992)).

But Winters argues that she could not reasonably have discovered her cause of action before 1991 because "not a single doctor who treated her or dealt with her NHL, ever told her that there might be even the possibility of a connection between Agent Orange exposure and NHL." Texas does not allow, however, for the

tolling of the limitations period until "a plaintiff discovers a specific cause of action against a specific defendant."  Id. at 1142 (citing Moreno, 760 S.W.2d at 357 n.9).  The question presented is not "whether a plaintiff has actual knowledge of the particulars of a cause of action . . .; rather, it is whether the plaintiff has knowledge of facts which would cause a reasonable person to diligently make inquiry to determine his or her legal rights."  Id. at 1141-42 (quoting Bell v. Showa Denko K.K., 899 S.W.2d 749, 754 (Tex.Ct.App. 1995)).  The media's coverage of the Agent Orange matter in the 80s placed within Winters's grasp such triggering facts.  "The discovery rule operates to trigger the statute of limitations once a plaintiff has the requisite knowledge, *regardless of whether or how the plaintiff is advised by the medical community*."  Vaught, 107 F.3d at 1142 (emphasis added) (also noting that a plaintiff "who may be incorrectly advised, may be precluded from pursuing her cause of action, even though she took the necessary investigatory steps mandated by the discovery rule").  Thus, under the "discovery rule," the two-year statute of limitations was triggered some time in the mid-80s and Winters's suit, filed in 1993, is barred.

## VI

In conclusion, we hold that the district court did not abuse its discretion when it declined to afford Judge Weinstein's remand decision in Ryan offensive collateral estoppel effect so as to bar the defendants' relitigation of the applicability of the Federal

40

Officer Removal Statute.  We further hold that the Federal Officer Removal Statute provides federal jurisdiction over this action and that the plaintiff's claims are barred by the Texas statute of limitations.  For the foregoing reasons, we AFFIRM the judgment entered by the district court.

A F F I R M E D.